**DOCTORS, INC., a/k/a Doctors Hospital, Appellant,**

**v.**

**BLUE CROSS OF GREATER PHILADELPHIA, a/k/a Associated Hospital Service of Philadelphia and Hospital Survey Committee, Inc.**

No. 73–1539.

United States Court of Appeals, Third Circuit.

Argued Nov. 8, 1973.

Decided Dec. 28, 1973.

John Francis Gough, Michael H. Malin, White & Williams, Philadelphia, Pa., for appellant.

Henry T. Reath, Duane, Morris & Heckscher, Philadelphia, Pa., for appellee Hospital Survey Committee, Inc.

Miles W. Kirkpatrick, Richard P. Brown, Jr., Stephen W. Armstrong, Raymond T. Cullen, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee Blue Cross of Greater Philadelphia.

Before VAN DUSEN, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This is an antitrust action brought by Doctors, Inc. ("Doctors"), a non-profit hospital located in Philadelphia. The defendant-appellees are Blue Cross of Greater Philadelphia ("Blue Cross") and Hospital Survey Committee, Inc. ("HSC"), a private, non-profit corporation which serves as an advisory plan-ning agency with respect to the coordination and planning of hospital and health services in Greater Philadelphia.

According to the complaint, Blue Cross dominates the third party hospital services payer market in Greater Philadelphia, purchasing more than fifty percent of all the hospital services sold in this area.[1] It is alleged that the effect of this dominance is to make it financially impossible for an area hospital to survive unless it is a Blue Cross member hospital since only these hospitals can be reimbursed for services provided to Blue Cross subscribers.

In 1972 Blue Cross sought to terminate the plaintiff's membership status. The complaint claims that this act was illegal, since it was taken pursuant to a scheme which is intended to control the area's hospital services market. It is alleged that this scheme violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1970), in the following ways: 1) because the two defendants have used the market power of Blue Cross to determine which hospital services will be provided in the area and which hospitals will provide them; 2) because they have entered into an illegal contract, combination and conspiracy, with others, to eliminate competition in the area's hospital services market; 3) because in furtherance of the overall scheme, Blue Cross (with HSC's cooperation) has illegally refused to deal with Doctors; and 4) because both defendants have induced an illegal boycott of the plaintiff hospital.

Each defendant responded to the complaint by filing a motion to dismiss for lack of subject matter jurisdiction. Their contention is that the complaint only alleges restraints upon intra-state trade or commerce and that the effects of these restraints upon interstate commerce are too remote to confer jurisdiction.[2] Defendant HSC later filed an

1. The area in question is Philadelphia and its surrounding suburbs. This includes five Pennsylvania and three New Jersey counties.

2. The memorandum of Blue Cross in support of this motion also suggested that the court should grant the motion because their activities are exempt from the Sherman Act by

alternate motion under F.R.Civ.P. 12(b) (6) to dismiss the complaint for failure to state a claim upon which relief can be granted. The thrust of this motion is that HSC could not have been a co-conspirator with Blue Cross since it is entirely independent of that organization and performs purely advisory services for it. It also argues that HSC's activities are not "trade or commerce" as those terms are used in Sections 1 and 2 of the Sherman Act.

The district court decision dealt solely with the motions to dismiss for lack of subject matter jurisdiction. It found that the interstate commerce allegations of the complaint were insufficient to confer jurisdiction and dismissed the action. This ruling is the primary question on appeal. In addition, defendant HSC argues that if we find for the appellant on this issue, we should still affirm the dismissal of the complaint with regard to it on the basis of their alternate motion to dismiss. We have concluded that the interstate commerce allegations of the complaint are sufficient to confer subject matter jurisdiction. In addition, we have decided that we cannot affirm on the alternative basis put forward by HSC. As a result, we reverse the dismissal of the complaint as to both defendants.

**I**

In order for the interstate commerce allegations of a Sherman Act complaint to be jurisdictionally sound, they must allege either 1) activities that are in the flow of interstate commerce, or 2) activities which though occurring purely on a local level substantially affect interstate commerce. *See, e. g.,* Rasmussen v. American Dairy Ass'n, 472 F.2d 517, 522 (9th Cir. 1972); Las Vegas Merchant v. Plumbers Ass'n v. United States, 210 F.2d 732, 739 n. 3 (9th Cir. 1954); ABA Antitrust Section, Antitrust Developments 1955–1968, at 39 (1968). In this case, the complaint and supporting affidavit have alleged numerous facts, which, it is claimed, established that the activities involved here meet both criteria, that is, they are in interstate commerce and substantially affect it as well.[3] Naturally, when considering the motions to dismiss which are in issue here, these factual allegations are assumed to be true, since the motions were interposed prior to the filing of responsive pleadings by the defendants. United States v. New Wrinkle, 342 U.S. 371, 373, 376, 72 S.Ct. 350, 96 L.Ed. 417 (1952); *see* Walker v. Food Machinery, 382 U.S. 172, 174–175, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).[3a]

We have made no attempt to judge the adequacy of every one of the plaintiff's allegations on the interstate

---

reason of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015 (1970). That statute exempts the insurance industry from antitrust liability to the extent it is regulated by state law.

While this claim might later prove to be meritorious, we express no opinion on it now, since it is not properly before us. The motions to dismiss were filed before either defendant submitted an answer. As a result, the essential facts necessary to support this claim of immunity have not as yet been pleaded. In addition, the applicability of the McCarran-Ferguson Act was not considered by the district court and was not briefed by either defendant in the present appeal.

3. Among these factual allegations are the following:
1) that the plaintiff hospital purchases services and supplies in interstate commerce

of almost $2,000,000 annually and that in 1972, $233,430 of its supplies came from companies located outside Pennsylvania;
2) that 9.6% of its patients came from outside Pennsylvania in 1972;
3) that Blue Cross distributed $208,635,550 in reimbursements to member hospitals located in both Pennsylvania and New Jersey;
4) that Blue Cross serves 2,380,000 subscribers who live in New Jersey as well as Pennsylvania;
5) that Blue Cross invests funds held for reimbursements to member hospitals in firms doing business in interstate commerce.

3a. We also note that at oral argument, appellee Blue Cross conceded the truth of these factual allegations for purposes of its motion to dismiss.

commerce issue since jurisdiction is established if any one of them satisfies either of the criteria for interstate commerce. We believe that under the existing precedents, plaintiff's factual allegations with regard to the effect upon the flow of out-of-state supplies, to Doctors and to other hospitals in the Greater Philadelphia area, are sufficient to establish that the alleged activities of Blue Cross and HSC substantially affect interstate commerce and therefore to establish jurisdiction.

The defendants are accused of using various illegal means to regulate and limit competition in hospital services in the Greater Philadelphia area. The necessary effect of these activities, according to the complaint, will be to close down Doctors Hospital and to close down or limit the operations of other area hospitals as well. As a result, it appears evident that the volume of supplies which are allegedly purchased by Doctors from companies located outside Pennsylvania each year ($233,430 in 1972) will be affected by the alleged activities. Moreover, the complaint alleges that Doctors activities are typical of those hospitals supplying hospital and health services throughout the United States. As a result, we must assume that like volume of out-of-state supplies are purchased by the approximately 100 other hospitals located in the Greater Philadelphia area. Since the overall scheme alleged in this complaint is directed at them also, this interstate commerce will be affected as well.

The key question in the case then is whether these clear "effects" on interstate commerce, caused by the activities alleged, are "substantial" enough to confer jurisdiction. Because this is an issue which involves many variables, no single, satisfactory test emerges from the precedent. When courts do speak in terms of a test, the formulations used

are, of necessity, so broad and generalized that instead of providing a guide to the solution of the problem they do no more than restate the issue.[4] In reality, they are not tests at all. We believe that a more accurate appraisal of the question is made by courts which concede that the issue requires "a practical, case-by-case economic judgment, not a conclusion derived from application of abstract or mechanistic forumlae." Rasmussen v. American Dairy Ass'n, 472 F.2d 517, 523 (9th Cir. 1972); see Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 232–233, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). That is, the issue is one of degree which defies precise tests and which necessarily yields somewhat imprecise resolutions.

As a result, the precedent in this area is unlikely to dictate the outcome in any given case. Instead, it is more likely to communicate a general sense as to how much of an impact local activities must have upon interstate commerce before they confer jurisdiction. With this in mind, we turn to the precedent.

Initially, we must deal with a series of cases which the appellees claim are controlling. In Spears Free Clinic and Hospital v. Cleere, 197 F.2d 125 (10th Cir. 1952), the complaint alleged a conspiracy in violation of Sections 1 and 2 of the Sherman Act which was intended to prevent operation of plaintiff's chiropractic hospital and to monopolize the "practice of the healing arts" in Colorado. The court affirmed a dismissal of the action because these alleged activities by the defendant did not have the necessary effect upon interstate commerce. This holding was followed in Elizabeth Hospital, Inc. v. Richardson, 269 F.2d 167 (8th Cir. 1959), a case which the court indicated was "on almost all fours" with *Spears*. *Id.* at 171. More recently, two district courts have reached the same conclusion in factually

4. *See, e. g.*, Page v. Work, 290 F.2d 323, 332 (9th Cir. 1961) ("the effect . . . must be direct and substantial, and not merely inconsequential, remote or fortuitous"); Spears Free Clinic and Hospital v. Cleere, 197 F.2d 125 (10th Cir. 1952) ("whether the effect . . . is direct and substantial or only incidental, indirect and remote").

similar cases, relying primarily on these two earlier decisions.[5]

There is no question about the factual similarity between *Spears* and its progeny, and the present case. If that case were persuasive authority we could undoubtedly rely on it to affirm the dismissal of the complaint in this action. However, the reasoning of *Spears* is defective in two major respects.

First, the opinion even when it was written placed primary reliance on a series of cases that were no longer valid.[6] These cases looked to the intent of the conspiracy alleged in order to determine whether the purported effects on interstate commerce conferred jurisdiction. If the aim of the conspiracy was to obstruct interstate commerce, it was said to have a "direct" effect and jurisdiction was present. If the goal was otherwise, the effect was termed "indirect" and there was no jurisdiction. This "direct-indirect" test had been abandoned by the Supreme Court in the early 1940's.[7] As a result, the reasoning of the opinion rested on flawed grounds even when it was issued in 1952.

Our second objection to the *Spears* case is that it is not in accord with the major relevant decisions which have been handed down since it was written.

Since *Spears,* the Supreme Court has dealt with two cases which, like the present case, alleged a conspiracy that was directed toward controlling a purely intrastate market for goods or services. In each of these cases it had no difficulty finding that there was a sufficient effect on the flow of out-of-state supplies to these local competitors to confer interstate commerce jurisdiction. Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967) (per curiam) (a division of markets by liquor wholesalers operating wholly within Oklahoma); United States v. Employing Plasterers Ass'n, 347 U.S. 186, 74 S.Ct. 452, 456, 98 L.Ed. 618 (1954) (control of competition in Chicago's plastering business).[8]

It is true that *Burke* can conceivably be distinguished on the basis that the interstate goods the supply of which is affected are the same goods that are sold in the intrastate market that is allegedly controlled. In contrast, the hospitals that comprise the market allegedly controlled in the present case provide a "product" that includes not only the out-of-state goods allegedly affected, but other services as well.[9] Likewise, it could be argued that *Employing Plasterers* can be distinguished since out-of-state plasterers, as well as in-state plasterers were allegedly excluded from the

5. Nankin Hospital v. Michigan Hospital Service, 361 F.Supp. 1199 at 1210 (E.D.Mich. 1973); Hospital Building Co. v. Trustees of Rex Hospital, 1973 Trade Cas. ¶ 74,428 (E.D.N.C.1973).

6. *See, e. g.,* Levering & G. Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933); United Leather Workers Int'l Union v. Herkert & Meisel Trunk Co., 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104 (1924), both of which are quoted at length in the *Spears* opinion.

7. Wickard v. Filburn, 317 U.S. 111, 120, 63 S.Ct. 82, 87 L.Ed. 122 (1942); Note, The Commerce Requirement of the Robinson-Patman Act, 22 Hastings L.J. 1245, 1250 (1971).

8. A willingness to find interstate commerce jurisdiction where there is a likely effect upon the interstate flow of supplies is reflected in more recent Courts of Appeal decisions as well. Ochsner Clinic v. N.L.R.B.,

474 F.2d 206 (5th Cir. 1973) (NLRB jurisdiction over labor activities at a hospital with a gross volume of $250,000 and purchases of $50,000 worth of materials and supplies in a six-month period); Glen Manor Home for the Jewish Aged v. N.L.R.B., 474 F.2d 1145 (6th Cir. 1973) (NLRB jurisdiction over labor activities at a nursing home *automatically* established since its annual gross volume is greater than $100,000); Rasmussen v. American Dairy Association, 472 F.2d 517 (9th Cir. 1972) (jurisdiction over alleged conspiracy to monopolize an intrastate market in milk products, where plaintiff purchased the ingredients for his "filled milk" out-of-state).

9. We should note, however, that in *Employing Plasterers,* like the present case, the fact that the product sold in the controlled local market was a mixture of the effected interstate goods and other services as well was not considered significant.

local market.[10] These arguable "distinctions" become insignificant, however, when one looks at the central thrust of the Supreme Court's approach in each of these cases. There is no discussion of "directness" or of the specific relationship between the interstate goods affected and the local market controlled. Nor is there even a concern with the specific magnitude of the impact on interstate commerce caused by the alleged conspiracy.[11] Instead, the Court in each case ends its inquiry when it has satisfied itself that the logical and therefore probable effect of the alleged act is to reduce the flow of goods in interstate commerce.[12]

Given this kind of analysis by the Supreme Court, we feel that the allegations in this case are more sensibly viewed as sufficient to confer jurisdiction since the present complaint closely parallels the essential facts and the reasoning of the *Burke* and *Employing Plasterers* cases. With regard to the facts, we note first that in all three cases an illegal course of conduct is alleged which purportedly seeks overall control of a local competitive market (here the market for hospital services). Second, it is claimed that the effect of the conspiracy is to limit competition and to eliminate some competitors (such as Doctors). Third, the complaint here, as in the earlier cases, alleges that a significant amount of traffic in out-of-state goods will be affected by the alleged acts. In *Burke* it was the flow into Oklahoma of out-of-state liquor sold by the wholesalers, and in *Employing Plasterers* it was the flow

of supplies used by local plasterers. Here, it is the flow of out-of-state supplies which are used by Doctors and the other area hospitals in providing their normal services.

On these facts, the Supreme Court concluded in both *Burke* and *Employing Plasterers* that the likely impact on the interstate flow of goods involved was sufficiently substantial to confer jurisdiction. The similarity between the facts in those cases and the facts of the present case are great. In all three cases the alleged conspiracy is aimed at an entire market so that if it does exist, it plainly limits overall competition. In addition, in each case it is quite likely that the flow of supplies allegedly affected will, in fact, decline if overall activity in the market declines. Given these similarities, we feel compelled to reach the same conclusion that the Supreme Court reached in the two earlier cases: the allegations with respect to the effect of the alleged activities upon interstate commerce are substantial enough to confer jurisdiction.

One final point with regard to this issue should be mentioned. Our most serious concern in following the logic of *Burke* and *Employing Plasterers* was the feeling that the effect is to read the interstate commerce clause out of the Sherman Act since it is virtually impossible to restrain commerce of any kind without in some way affecting the flow of out-of-state supplies. A review of some of the more recent decisions by the various Courts of Appeal, however, has removed this concern. We are convinced

---

10. Here, we should note, however, that in *Burke*, as in the present case, all of the competitors regulated by the purported conspiracy operated wholly within Oklahoma.

11. The lack of concern with this factor is made explicit in Rasmussen v. American Dairy Ass'n, 472 F.2d 517 (9th Cir. 1972): "The quantitative effect on the interstate flow of . . . ingredients is not alleged. But it is the nature of the effect that is important: to whatever extent, it is certain that the flow of . . . ingredients into Arizona *will* be diminished

. . . ." *Id.* at 525 (emphasis in original).

12. In fact, a per curiam opinion was handed down in *Burke*, despite the fact that the evidence indicated that sales of out-of-state liquor to Oklahoma wholesalers had actually *increased* since the alleged division of markets had begun. The Court was content to conclude that given the nature of the alleged restraint and a rise in personal income substantially greater than the rise in liquor sales, an even greater increase in the sale of out-of-state liquor probably would have occurred absent the conspiracy.

that the "interstate commerce" requirement continues to act as a limitation on Sherman Act complaints since many situations remain in which the flow of supplies into the state will not be substantial enough to confer jurisdiction.

In Lieberthal v. North Country Lanes, Inc., 332 F.2d 269 (2d Cir. 1964), for example, the complaint alleged that the defendants had conspired to prevent the opening of a competitive bowling alley. In this case, the court held that though the flow of out-of-state supplies would be diminished, this did not confer jurisdiction. Since the conspiracy was only aimed at a single bowling alley and since the outfitting of that bowling alley was a one time event, the alleged effect was held to be too insubstantial. Similarly, in Page v. Work, 290 F.2d 323 (9th Cir. 1961), the complaint alleged that a conspiracy to control the specialized field of legal advertising in Los Angeles substantially affected the flow of national display advertising, news dissemination, and newsprint. Here, once again, the court held that this jurisdictional claim was insufficient. Since virtually the entire demand for these materials came from businesses which did not rely on the publication of legal notices for revenue, the effect of the conspiracy on the flow of these supplies could not be "substantial." We feel that both of these cases remain good law and that they exemplify the kinds of cases which remain beyond the reach of interstate commerce jurisdiction.

## II

The final issue in the case is whether we should still affirm the judgment dismissing the complaint with respect to HSC on the basis of its alternate motion to dismiss for failure to state a claim upon which relief can be granted. The appellant contends that we cannot affirm on this basis, since the alternate motion was filed only after the court had issued an order staying all proceedings pending a decision on the motions to dismiss for lack of subject matter jurisdiction. As a result, this second motion could not have been considered by the district court.

■ We feel that this procedural claim has merit. It has been the consistent policy of this court not to consider, "arguments on issues of fact not raised or presented to the district court." Andrews v. Chemical Carriers, Inc., 457 F.2d 636, 640 (3d Cir. 1972). This principle has clear application here since the factual averments contained in the alternate motion to dismiss and the Helme affidavit which supports it were only presented to the district court after it had stayed all proceedings.[13]

■ Moreover, even if the stay had never been issued, we still could not find a proper presentation of these factual questions since the alternate motion was filed with the district court just one day prior to oral argument. Because of this, there was no realistic opportunity for the appellant to respond, even if a re-

13. We note that the alternate motion seeks dismissal on a number of grounds. Most are based upon factual allegations which are first raised in the Helme affidavit and which according to the motion are contradictory to the complaint. However, several seem to raise purely legal grounds for dismissal. As a result, it can be argued that these latter contentions are outside the rule in *Andrews* since that case only bars our consideration of arguments on issues of *fact* not raised. Under this theory, we would still be free to consider these purely legal arguments as an alternative basis for affirming the dismissal as to HSC.

Despite the technical logic of this argument, we do not feel we should consider these issues. The rule applied in *Andrews* is designed to further sound principles of ju-

dicial administration. 457 F.2d at 640. To further this goal, we must reject an approach which requires this court to examine the appellant's motion in detail in order to decide which arguments have a factual dimension and which are purely legal before it can tell which issues are properly before it. Such an approach involves a needless expenditure of judicial energies. Since the motion is primarily based upon arguments that rely on questions of fact not raised before the district court, we feel the entire motion should be returned to that court for initial consideration.

We naturally express no opinion on the further question as to whether purely legal isues not raised in the district court can be considered by this court de novo.

sponse was technically permissible. Clearly, issues of fact are not properly "raised or presented" before a court if the opposing party has had no opportunity to answer them.

As a result, the issues raised in HSC's alternate motion to dismiss cannot be considered by this court and cannot affect the outcome of the present appeal. However, this in no way suggests that they may not ultimately prove to be meritorious. We emphasize that the district court on remand, and at the appropriate time, must consider the issues raised by this motion, such as whether HSC's activities constitute "trade and commerce" as those terms are used in Sections 1 and 2 of the Sherman Act. *See* Marjorie Webster Jr. Col. v. Middle States Ass'n of Colleges and Secondary Schools, 139 U.S.App.D.C. 217, 432 F.2d 650, 654 (1970), cert. denied 400 U.S. 965, 90 S.Ct. 367, 27 L.Ed.2d 384 (1970).

The order of the district court will be reversed and the case remanded.