**UNITED STATES of America, Plaintiff-Appellee,**

v.

**FINIS P. ERNEST, INC., and Modern Asphalt Paving and Construction Co., Defendants-Appellants.**

Nos. 74–1276, 74–1277.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1974.

Decided Jan. 29, 1975.

Rehearing Denied Feb. 25, 1975.

Edward G. Maag, Belleville, Ill., Phillip A. Montalvo, E. St. Louis, Ill., for defendants-appellants.

Henry A. Schwarz, U. S. Atty., and Jack A. Strellis, Asst. U. S. Atty., E. St. Louis, Ill., for plaintiff-appellee.

Before MARIS* and HASTINGS, Senior Circuit Judges, and TONE, Circuit Judge.

HASTINGS, Senior Circuit Judge.

Defendants Finis P. Ernest, Inc. (Ernest) and Modern Asphalt Paving and Construction Co. (Modern) were indicted under a single count indictment for violation of the Sherman Act, 15 U.S.C. § 1, for a combination and conspiracy to submit collusive, non-competitive and rigged bids to the City of East St. Louis, Illinois, for a city sanitary sewer project. The case was tried to a jury, the Honorable James L. Foreman, Judge, presiding, and the jury found both defendants guilty. The court denied all of defendants' post-trial motions and imposed fines of $35,000 and costs on Ernest and $15,000 and costs on Modern.

Defendants raise three issues in this appeal:

(1) Whether there was sufficient evidence to prove the jurisdictional re-

---

* Senior United States Circuit Judge Albert Branson Maris of the Third Circuit is sitting by designation.

quirement of a restraint of interstate commerce;

(2) Whether the evidence was sufficient to prove a conspiracy between the defendants to rig bids; and

(3) Whether the court erred in admitting evidence showing that Modern had insufficient funds in its checking account to cover the check which it submitted to the city with its bid.

## JURISDICTION

The Sherman Act, 15 U.S.C. § 1, states: "Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." The Supreme Court has recently reiterated that jurisdictional inquiry under this general language requires a particularized judicial determination which must turn on the circumstances presented in each case. Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 197 fn. 12, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). See also Rasmussen v. American Dairy Association, 9 Cir., 472 F.2d 517, 526–527 (1972), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

In the instant case, the government introduced evidence that materials used by Ernest in construction of the sanitary sewers were manufactured outside the State of Illinois. Clay sewer pipe manufactured in Indiana and manhole frames and covers manufactured in Wisconsin were purchased from Sidener Supply Company in Illinois. A sewer pumping station was purchased from Davco Manufacturing Company in Georgia. The cost of these items was approximately $9,307. The project was built under contract with the City of East St. Louis with funds supplied by the United States Department of Housing and Urban Development (HUD). In February 1971 HUD approved $300,000 for public improvements, primarily sewer construction. In October 1971, after the city had

had to reject bids for sanitary and storm sewer construction because they substantially exceeded the engineer's estimate, the city requested an additional $300,000 for these projects and the increase was approved by HUD in February 1972. The question is whether these facts and the inferences which may be drawn therefrom satisfy the jurisdictional requirement of the Sherman Act.

In determining whether particular circumstances constitute a "restraint of trade or commerce among the several states" courts have taken differing approaches. See, for example, Eiger, The Commerce Element in Federal Antitrust Litigation, 25 Fed.B.J. 282 (1965); Note, Portrait of the Sherman Act as a Commerce Clause Statute, 49 N.Y.U.L.Rev. 323 (1974). Problems of interpretation seem to be due in large part to the fact that the "single cryptic phrase defines both the conduct prohibited by the Act and the statute's jurisdictional reach." Rasmussen v. American Dairy Association, 9 Cir., 472 F.2d 517, 521 (1972), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

Our problem of interpretation is whether the elements of restraint and interstate commerce may be satisfied separately or whether jurisdiction requires that the restraint be upon the interstate commerce. In several recent cases the Court of Appeals for the Ninth Circuit has viewed the question of jurisdiction under the Sherman Act as entirely one of constitutional power: whether defendants' conduct had a sufficient relationship to interstate commerce to be subject to regulation by Congress. Gough v. Rossmoor Corp., 9 Cir., 487 F.2d 373, 376 (1973); In re Western Liquid Asphalt Cases, 9 Cir., 487 F.2d 202 (1973), rev'd in part sub nom. Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). *See also* Ford Wholesale Co. v. Fibreboard Paper Products Corp., 9 Cir., 493 F.2d 1204, cert. denied, 419 U.S. 876, 95 S.Ct. 138, 42 L.Ed.2d 115 (1974).[1]

---

1. See the discussion of Sherman Act jurisdiction in A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Assn., 7 Cir., 484 F.2d 751, 755–759 (1973), cert. denied, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974).

The analysis of In re Western Liquid Asphalt Cases is illustrative of this approach. The Ninth Circuit's decision there on the issue of Sherman Act jurisdiction was unaffected by the Supreme Court's decision in the case reported as Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), since the Court had limited its grant of certiorari to the questions of jurisdiction under the Clayton and Robinson-Patman Acts.[2] In that case the dispute concerned asphaltic concrete which was produced in California and delivered to construction sites in California only. The Court of Appeals held that jurisdiction under the Sherman Act was satisfied because the "production of asphalt for use in interstate highways rendered the producers 'instrumentalities' of interstate commerce and placed them 'in' that commerce as a matter of law." 487 F.2d at 204. The court's bifurcated analysis made it unnecessary in deciding the question of jurisdiction to consider whether any interstate commerce was allegedly restrained. This approach, which widens the reach of the Act, finds some support in decisions of the Supreme Court which emphasize that Congress in the Sherman Act intended to exercise the full extent of its constitutional authority under the Commerce Clause. See, e. g., Gulf Oil Corp., supra, at 201, 95 S.Ct. 392; United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951 (1945); United States v. South-Eastern Underwriters Association, 322 U.S. 533, 557–559, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311 (1940).

■ In situations such as the instant case, which involve per se violations of the Act, there is an additional reason for not requiring proof of an adverse impact on interstate commerce to satisfy the jurisdictional requirement. A per se violation is activity, such as price fixing, for which effects need not be shown to establish the substantive offense. Restraints in this category "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Where activity falls within one of these classes of restraints it is "not for the courts to decide whether in an individual case injury had actually occurred" in determining whether there has been a substantive violation of the Act. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 211, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959). It may be anomalous to require proof of effects to satisfy jurisdiction in those cases where proof of effects is not necessary to establish the substantive offense. See P. Areeda, Antitrust Analysis § 178 (1967).

The alternative approach to Sherman Act jurisdiction which considers the nexus between restraint and interstate commerce is supported by other decisions of the Ninth Circuit, decisions in other circuits, as well as by other language of the Supreme Court.

The jurisdictional analysis in Page v. Work, 9 Cir., 290 F.2d 323 (1961), seems inconsistent with the Ninth Circuit's most recent decisions, yet Page continues to be cited with approval in those cases. In Page, the complaint alleged that the defendants eliminated competition in legal advertising in Los Angeles County. The court noted that the defendant newspapers bought newsprint from outside the state, carried some national news and advertising and had some out-of-state subscribers. The court nevertheless concluded that since the claimed restraints were "on a purely local level and were wholly directed to [the] local intrastate market," 290 F.2d at 330, the

---

2. But see the comment of Mr. Justice Douglas that the Court's holding might result in a different determination of the Sherman Act question on remand 419 U.S. at 208 n. 6, 95 S.Ct. 392. (Douglas, J., dissenting).

jurisdictional requirement of the Sherman Act was not satisfied. The court said, "The test of jurisdiction is not that the acts complained of affect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business." 290 F.2d at 330. In distinguishing a group of other newspaper cases the court said further, "[i]n all the above cases a restraint of interstate commerce was found which was determinative of federal jurisdiction." 290 F.2d at 331. There is no question in *Page* that the locus of the restraint was a consideration in determining jurisdiction. *See also,* Sun Valley Disposal Co. v. Silver State Disposal Co., 9 Cir., 420 F.2d 341 (1969).

Other courts have also found jurisdiction absent where interstate activities were alleged where there was no showing that the restraint operated on the interstate commerce. Rosemound Sand & Gravel Co. v. Lambert Sand & Gravel Co., 5 Cir., 469 F.2d 416 (1972); Lieberthal v. North County Lanes, Inc., 2 Cir., 332 F.2d 269 (1964); Elizabeth Hospital, Inc. v. Richardson, 8 Cir., 269 F.2d 167, cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); Saint Anthony-Minneapolis, Inc. v. Red Owl Stores, Inc., 316 F.Supp. 1045 (D.Minn.1970).

The Supreme Court has never decided the question of whether a business with out-of-state activities which engages in a local conspiracy to restrain commerce falls within the jurisdiction of the Sherman Act even though there is no restraining effect on interstate commerce. In deciding related questions, however, the Court has used language which might suggest that an interstate restraint is required for jurisdiction.

In a landmark case holding that a locally applied restraint came within the purview of the Act if the result was to restrain interstate commerce, the court stated the jurisdictional issue like this: "We first should be satisfied that the activities on which restraints are alleged to have been exerted constitute commerce among the states." United States v. Women's Sportswear Manufacturers

Association, 336 U.S. 460, 461, 69 S.Ct. 714, 714, 93 L.Ed. 805 (1949). The Court went on to explain that whether defendants were engaged in interstate commerce was not determinative.

> The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze. 336 U.S. at 464, 69 S.Ct. 714.

In its recent decision in *Gulf Oil Corp., supra,* the Supreme Court quoted this language from *Women's Sportswear* and briefly reviewed, in dicta, the jurisdictional requirement of Section 1 of the Sherman Act. The Court said, "The jurisdictional reach of § 1 thus is keyed directly to effects on interstate markets and the interstate flow of goods." 419 U.S. at 195, 95 S.Ct. 392. After noting that Section 1 was designed to utilize the full extent of the constitutional power under the commerce clause, the Court went on to state that a local contract, combination or conspiracy "may constitute a retraint within the meaning of § 1 if it substantially and adversely affects interstate commerce." *Id.*

The possibility that an adverse effect upon interstate commerce is a jurisdictional requirement is also suggested by language in earlier decisions of the Court. *See, e. g.,* United States v. Employing Plasterers Association, 347 U.S. 186, 188, 74 S.Ct. 452, 98 L.Ed. 618 (1954); Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 234, 238–239, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).

■ Thus, there is substantial support for both responses to the question of whether Sherman Act jurisdiction requires proof of a restraint on interstate commerce. We need not resolve that issue here, however, because we are convinced that there is sufficient evidence

in this case to support a finding of jurisdiction under either approach.

■ Under the first approach we need only find that the restraint is sufficiently related to commerce that Congress has jurisdiction to act. Here, alleged bid rigging enabled Ernest to obtain the city sewer contract and in performing that contract it used approximately $9,307 worth of materials obtained in interstate commerce. This relationship is sufficient to assure that application of the Sherman Act to this case is not beyond the constitutional authority of Congress. Where a *per se* restraint is involved, the quantity of interstate commerce is unimportant. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 309–310, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); United States v. Bensinger Co., 8 Cir., 430 F.2d 584, 588 (1970).

■ If, however, proof of a restraint of interstate commerce is required for jurisdictional purposes, there are sufficient facts to warrant such a finding. Although there was evidence that the price of $9,307 worth of materials was not affected by the alleged bid rigging since the sellers charged their standard prices for the items sold, there is still evidence to support inferences that the defendants' activity had a restraining effect upon interstate commerce.

The restraint potentially reduced competition in materials in interstate commerce. If there had been genuine competitive bidding, each contractor, in an effort to make the lowest bid, would have obtained competitive prices from materials suppliers. The effect of the restraint was that neither Ernest nor Modern had any incentive to obtain competitive prices from out-of-state suppliers.

Further, where bids are rigged, the price the city will have to pay for the project is artificially increased. The disparity between the bids and the city engineer's lower estimate of the cost of the

project is some evidence that the effect of the defendants' activity was to increase the city's cost for the project. Increasing the city's cost restrains interstate commerce in at least two ways. First, funds for the project came from HUD and its appropriation to the city had to be increased after the bid, higher than the engineer's estimate, was received. HUD funds are transferred in interstate commerce. An increase in the amount of money required for this project would inevitably mean that there would be less money available for HUD projects elsewhere in the United States. Second, where the city must use more of its available funds to complete the sewer project it will have less money to expend for other projects requiring use of goods shipped in interstate commerce.

We therefore hold that there was sufficient evidence introduced at trial to satisfy the jurisdictional requirement of the Sherman Act.

## SUFFICIENCY OF THE EVIDENCE

Appellants argue that the evidence at trial was insufficient to prove that defendants conspired to rig bids for the city sewer construction project. It is not for an appellate court to weigh the evidence or determine the credibility of witnesses. "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. . . . Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances'." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Where the evidence is circumstantial it is not necessary that it be such as to exclude every reasonable hypothesis other than that of guilt. As with direct evidence, it is only necessary that the jury be convinced of guilt beyond a reasonable doubt. Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954).[3]

---

3. *Cf.* United States v. McCarthy, 7 Cir., 196 F.2d 616, 619 (1952), decided by our court prior to the decision in *Holland*. While other

courts of appeals have since rejected, in light of *Holland*, the rule of circumstantial evidence followed in *McCarthy*, our court has not pre-

Our review of the evidence in the light most favorable to the government indicates that it was sufficient to prove that the defendants conspired to submit collusive bids to the City of East St. Louis.

Bids for the sanitary sewer project were first let on January 30, 1971. Ernest's bid was rejected because it was the only bid submitted for that project and because it substantially exceeded the city engineer's estimate for the cost of the job.

The sanitary sewer job was put up for rebidding on August 6, 1971. This time, only Ernest and Modern submitted bids. Ernest was awarded the contract. The bids were submitted in the form prescribed by the city which called for the listing of sixteen unit prices. Each unit price was to include all labor, materials, overhead, profit, insurance and all other costs required to cover the finished work. Although materials costs might sometimes be standardized, there were no standard prices for unit prices such as these including so many uncertain variables. Nevertheless, in the bid submitted by Modern seven of the sixteen unit prices were identical to those in the Ernest bid. For each of the other nine unit prices, the bid submitted by Modern was slightly higher than Ernest's bid. The differences in the prices on those items suggest that unit prices of the Modern bid had been arrived at by making simple changes in the unit prices from the Ernest bid. For example, Ernest's unit price for the first item, laying eight inch sewer pipe at depths of from six to nine feet, was $12.19, while Modern's bid was $13.19. Modern's bids on seven of the unit prices could have been the result of merely rounding off Ernest's bids for those items. For example, Ernest's bid for item three was $33.42 and Modern's was $33.50. The pumping station price on the Modern bid had been altered on the form from $49,-050 to $50,550 so as to suggest that it had been deliberately changed to be higher than the Ernest price of $49,750.

There was other evidence that the Modern bid was not a serious one and was submitted so that there would be an appearance of competitive bidding. Modern's bid had been prepared on the morning the bids were due by one of its employees working at home without anyone's assistance. No one from Modern inspected the work site or contacted any suppliers.

There were also indications that Modern did not believe it could get the sewer job. It had submitted bids on other contracts which, when combined with this contract, would have committed Modern to construction jobs beyond the amount for which it could obtain a performance bond. Further, it did not appear that Modern expected the city to cash its check submitted with its bid because its checking account did not contain sufficient funds to cover the check.[4]

The government also showed that the two companies would have had an opportunity to agree upon a collusive bid because during the summer when the bids were submitted they were working together on a driveway project.

We find that there was substantial evidence to support the jury's verdict.

## ADMISSION OF EVIDENCE

Finally, appellants argue that it was error to admit testimony of a bank cashier and Modern's bank statements indicating that there were insufficient funds in its checking account to cover the full amount of Modern's bid check. Appellants object to the evidence as irrelevant, improper rebuttal testimony, and impeachment on a collateral matter. The trial court held the evidence admissible and relevant to the question of the seriousness of Modern's bid. We agree.

---

viously had occasion to reconsider the issue. See United States v. Currier, 1 Cir., 454 F.2d 835, 838, 838 n. 6 (1972).

4. Although appellants claim that it was error to admit evidence concerning the checking account, as we discuss *infra*, we find the evidence was properly admitted.

Appellants contend that the evidence was in the nature of impeachment and collateral to any issue in the case. Impeachment is an attack upon the credibility of a witness. A witness' testimony may be contradicted without being impeached. United States v. Williamson, 5 Cir., 424 F.2d 353, 355 (1970). Here, the evidence was admissible for a purpose other than impeachment. Modern had introduced evidence to attempt to establish that its bid for the sewer job was a serious one despite the fact that it had not submitted a certified check as required by the bid specifications. The government in rebuttal introduced the evidence of insufficient funds in an attempt to demonstrate that the check was not indicative of a serious bid. The function of rebuttal is to explain, repel, counteract or disprove the evidence of the adverse party. United States v. Mallis, 3 Cir., 467 F.2d 567, 569 (1972); United States v. Crowe, 7 Cir., 188 F.2d 209, 213 (1951). There was no abuse of discretion in admitting the evidence in rebuttal.

The convictions appealed from are, in all respects, affirmed.

Affirmed.