**UNITED STATES of America, Plaintiff-Appellee,**

v.

**AZZARELLI CONSTRUCTION CO. and John F. Azzarelli, Defendants-Appellants.**

**Nos. 79–1348, 79–1349.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1979.

Decided Dec. 28, 1979.

Rehearing and Rehearing En Banc Denied Feb. 12, 1980.

George J. Cotsirilos, Chicago, Ill., for defendants-appellants.

Daniel J. Conway, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before PELL and BAUER, Circuit Judges, and DUMBAULD, Senior District Judge.*

DUMBAULD, Senior District Judge.

Appellants Azzarelli Construction Company, and John F. Azzarelli, its vice-president, where convicted of bid-rigging on three highway projects in Illinois in violation of Section 1 of the Sherman Act, 15 U.S.C. 1, and of twelve counts of mail fraud in violation of 18 U.S.C. 1341. The corporation was fined $200,000 on the antitrust count and a total of $12,000 on the mail fraud counts. Azzarelli was fined $25,000 and sentenced to a suspended two-year prison term with three years' probation after serving the first ninety days.

Other defendants indicted are not involved in this appeal. Azzarelli's brother Joseph, president of the company, was acquitted by the jury. Central States Engineering, Inc. was acquitted of mail fraud charges but convicted of the antitrust violation, and has not appealed. Loitz Brothers Construction Company, and its affiliate Kankakee Paving Corporation pleaded guilty to the Sherman Act count and to one count of mail fraud.

The dealings which led to the collusive bids were conducted by Lawrence Loitz for Loitz Brothers and Kankakee Paving, by Larry Boettcher for Central States, and by John Azzarelli for Azzarelli Construction Company. The three men carried on their discussions at a hotel in Springfield the day before the bidding was to take place.

---

* The Honorable Edward Dumbauld, Senior District Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation.

## I—THE SHERMAN ACT

The Sherman Antitrust Act of July 2, 1890, 26 Stat. 209, 15 U.S.C. 1, has been likened to a charter of economic liberty, expressing a national policy akin to constitutional principles in importance and impact upon the general welfare.

As well stated by the late Mr. Justice Hugo Black:

The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits "Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States." Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which "unreasonably" restrain competition. *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619;] *Chicago Board of Trade v. United States,* 246 U.S. 231 [38 S.Ct. 242, 62 L.Ed. 683].

However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129; division of markets, *United States v. Addyston Pipe & Steel Co.,* 6 Cir., 85 F. 271, 46 L.R.A. 122, affirmed 175 U.S. 211 [, 20 S.Ct. 96, 44 L.Ed. 136;] group boycotts, *Fashion Originators' Guild v. Federal Trade Comm.,* 312 U.S. 457 [, 468, 61 S.Ct. 703, 85 L.Ed. 949;] and tying arrangements, *International Salt Co. v. United States,* 332 U.S. 392 [, 68 S.Ct. 12, 92 L.Ed. 20].[1]

The case at bar is a typical or classical example of division of markets or allocation of business by bid-rigging which has been recognized as a *per se* violation since the Taft opinion in *Addyston Pipe.* Able defense counsel ingeniously seeks to modify the traditional contours of *per se* violations by inserting an additional element in the definition of such an offense.

---

1. *Northern Pac. R. Co. v. U. S.,* 356 U.S. 1, 4–5, 78 S.Ct. 514, 517–518, 2 L.Ed.2d 545 (1958). This statement echoes an earlier pronouncement by Mr. Chief Justice Charles Evans Hughes in *Appalachian Coals, Inc. v. U. S.,* 288 U.S. 344, 359–60, 53 S.Ct. 471, 474, 77 L.Ed. 825 (1933): "The purpose of the Sherman Anti-Trust Act is to prevent undue restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influences of monopolistic endeavor. As a charter of freedom, the Act has a generality and adaptability comparable to that found to be desirable in constitutional provisions." On the fluctuating judicial construction regarding the "rule of reason" interpolation see Robert H. Jackson and Edward Dumbauld "Monopolies and the Courts," 86 U. of Pa.L.R. (January, 1938), 231, 242–49; and *Continental T. V. Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49–59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

The contention is thus formulated in appellants' brief (p. 56): "To invoke the *per se* rule . . . the Government is required to prove not only a price-fixing, bid-rigging or job allocation agreement, but it must also prove, as an element of the offense, that the conspiratorial activities involved transactions *in the flow* of interstate commerce.[2] "

■ In other words, appellants argue that a *per se* violation can occur only in a "flow" of commerce situation, and not in an "affecting" commerce situation. This argument, unsupported by authority, is untenable. It confuses the type of *restraint ("per se"* or "unreasonable") with the type of nexus with *commerce* ("in" or "affecting").

With respect to the restraints forbidden by § 1 of the Sherman Act[3] the cases have recognized that in enacting § 1 Congress "wanted to go to the utmost extent of its Constitutional power" and hence that "however local its immediate object, a 'contract, combination . . . or conspiracy' nonetheless may constitute a restraint within the meaning of § 1 if it substantially and adversely affects interstate commerce."[4]

*Goldfarb v. Va. State Bar*, 421 U.S. 773, 780, 784–85, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), obviously is inconsistent with appellants' contention. That was a *per se* price-fixing case (with respect to fees charged by lawyers for title searches, a local activity) and was likewise a case "affecting" interstate commerce.[5]

We now turn to appellants' most plausible contention, that the evidence in the case shows that the interstate commerce affected had terminated, by reason of processing which transformed the nature of the material moving in interstate commerce. Appellants produced an expert witness to prove chemical and molecular change, or the creation of a new product, when crude oil and asphaltic cement were combined to make the bituminous concrete used in the highway construction affected by appellants' rigged bids.

■ It is doubtful whether, even under the "flow" theory such a change would suffice to render § 1 of the Sherman Act inapplicable. In *Swift & Co. v. U. S.*, 196 U.S. 375, 399, 25 S.Ct. 276, 49 L.Ed. 518 (1905), Mr. Justice Holmes considered fresh meat (as well as cattle) subject to injunction under the antitrust law. And clearly, under the "affecting commerce" theory [which in the case at bar was adequately presented to the jury, unlike *Las Vegas Merchant Plumbers Assn. v. U. S.*, 210 F.2d 732, 746–47 (C.A. 9, 1954)], the restraint could be one which operated either before, during, or after the interstate movement.[6] In similar vein, the eloquent dissent of Mr. Justice Holmes in *Hammer v. Dagenhart*, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), refuted the majority view in that case that commerce in goods produced by child labor was unlike situations where "the use of interstate transportation was necessary to the accomplishment of harmful re-

---

**2.** Italics supplied. On the following page appellants recognize that conspiracies violating § 1 of the Sherman Act may either "affect commerce" or occur "in commerce." The second class are described as "in the flow" of commerce. On "flow" see *Chicago Bd. of Trade v. Olsen*, 262 U.S. 1, 35, 43 S.Ct. 470, 67 L.Ed. 839 (1923); *Stafford v. Wallace*, 258 U.S. 495, 515–21, 42 S.Ct. 397, 66 L.Ed. 735 (1922); and *Swift & Co. v. U. S.*, 196 U.S. 375, 398–400, 25 S.Ct. 276, 49 L.Ed. 518 (1906). The jury was instructed on both theories. See Government's Instruction No. 18 and Defendant's Instruction No. 53 which were given by the Court without modification.

**3.** Unlike the Robinson-Patman Act, see *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194–95, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974).

**4.** The quoted language is from the case cited in note 3, *supra*. The Court there goes on to quote the colorful aphorism of Justice Robert H. Jackson, "If it is interstate commerce that feels the pinch it does not matter how local the operation which applies the squeeze." *U. S. v. Women's Sportswear Mfrs. Assn.*, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).

**5.** The Court held that the necessity of a title examination to assure a valid lien for interstate lenders demonstrated "that interstate commerce has been sufficiently *affected*." 421 U.S. at 785, 95 S.Ct. at 2012 (italics supplied).

**6.** 210 F.2d at 740; *Evans v. S. S. Kresge Co.*, 394 F.Supp. 817, 830, 837 (W.D.Pa.1975).

sults." [7]   Holmes retorted: "It does not matter whether the supposed evil precedes or follows the transportation.  It is enough that in the opinion of Congress the transportation encourages the evil." [8]

■ Appellants' contention falls within the category of "mechanical distinctions" condemned in *Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 229, 68 S.Ct. 996, 1002, 92 L.Ed. 1328 (1948). Such artificial separation of production and manufacturing from commerce "without regard to their economic continuity" would be a "reversion to conceptions formerly held [9] but no longer effective to restrict either Congress' power  .  .  .  or the scope of the Sherman Act's coverage."  Such a reversion to outmoded concepts, rejected in *Mandeville* almost forty years ago, is *a fortiori* unavailing now.  In *Mandeville* the distinction was between sugar beets and manufactured sugar.  The Court was not impressed by this transformation, and applied the doctrine of *Wickard v. Filburn* which had dealt with an "identical commodity [wheat] from the planting stage through the phase of interstate distribution."  334 U.S. at 237, 68 S.Ct. at 1007.  The Court concludes that "mere change in the form of the commodity or even complete change in essential quality by intermediate refining, processing or manufacturing does not defeat application of the statute  .  .  . .[10]

Again, as we have said, the vital thing is the effect on commerce, not the precise point at which the restraint occurs or begins to take effect  .  .  .. Hence .   . the mere fact that the price fixing related directly to the beets did not sever or render insubstantial its effect subsequently in the sale of sugar."  334 U.S. at 238, 68 S.Ct. at 1007.  Similarly it seems clear that in the case at bar the fact that the price fixing impinged on the new product (asphalt concrete) rather than the ingredients thereof did not diminish its impact or render insubstantial its effect on the sale of crude oil and asphaltic cement in interstate commerce.

■ One type of substantial effect upon interstate commerce in the materials used for road construction in Illinois flows from the diminished funding available for highway construction, by reason of the impact of appellants' conspiracy to submit bids at non-competitive prices.  This type of harmful effect upon interstate commerce suffices in antitrust cases, as well as in cases involving other types of obstruction to interstate commerce.[11]  *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 744–45, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Burke v. Ford*, 389 U.S. 320, 321–22, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); [12] *U. S. v. Finis P. Ernest, Inc.*, 509 F.2d 1256, 1261

7.  247 U.S. at 271, 38 S.Ct. at 531.  The case was overruled, and the Holmes reasoning adopted, in *U. S. v. Darby*, 312 U.S. 100, 114–17, 61 S.Ct. 451, 85 L.Ed. 609 (1941).  See Dumbauld, *The Constitution of the United States* (1964) 131–32.

8.  247 U.S. at 279–80, 38 S.Ct. at 534.

9.  As in the discredited case of *U. S. v. E. C. Knight Co.*, 156 U.S. 1, 17, 15 S.Ct. 249, 39 L.Ed. 325 (1895), now superseded by cases such as *Wickard v. Filburn*, 317 U.S. 111, 122–25, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

10.  See also *Doctors, Inc. v. Blue Cross*, 490 F.2d 48, 52–53 (C.A. 3, 1973).  Of course there are situations, unlike the application of the Sherman Act, where transformation into a new product would be material.  Examples are the application of rates and tariffs on specified commodities by the Interstate Commerce Commission or the Court of Customs and Patent Appeals; or questions of an owner's right to

reclaim his property when commingled with that of another, as when a famous artist paints a portrait on canvas belonging to someone else.  See Dumbauld, *Thomas Jefferson and the Law* (1978) 110.

11.  For recognition of this type of harmful effect upon interstate commerce in cases not arising under the Sherman Act, see *Heart of Atlanta Motel v. U. S.*, 379 U.S. 241, 257, 273–74, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *U. S. v. Mazzei*, 521 F.2d 639 (C.A. 3, 1975); *U. S. v. Long*, 534 F.2d 1097, 1099 (C.A. 3, 1976); *U. S. v. DeMet*, 486 F.2d 816, 821–22 (C.A. 7, 1973); *U. S. v. Braasch*, 505 F.2d 139, 147 (C.A. 7, 1974).

12.  This case also disposes of appellants' argument based on termination of interstate commerce when commodities "come to rest" in a warehouse before use within the destination State.  389 U.S. at 321, 88 S.Ct. 443.

(C.A. 7, 1975); *Doctors, Inc. v. Blue Cross,* 490 F.2d 48, 51–53 (C.A. 3, 1973). It is undeniable that appellants' conspiracy by increasing the cost of highway projects using asphalt concrete made from crude oil and asphaltic cement moving in interstate commerce substantially and adversely affected such commerce in those commodities. These highway construction projects obviously had more than a *de minimis* effect on interstate commerce. The total of the lowest bids on the three items involved was $3,192,085.54. (In the *Ernest* case the amount of plaintiffs interstate purchases of supplies was only $9,307. 509 F.2d at 1261).

## II—ADMISSIBILITY AND SUFFICIENCY OF EVIDENCE

Appellants further contend that declarations of coconspirators were improperly received. It is asserted that a pre-trial determination, akin to a motion to suppress, should have been made; and that findings should have been made showing why the evidence was admitted. These steps are not required by the Federal Rules of Evidence or by this Court's decision in *U. S. v. Santiago,* 582 F.2d 1128, 1131–36 (C.A. 7, 1978).

The normal practice, it would seem, would be for a defendant to object at the time the challenged statement is offered. Thereupon, either during a recess granted the jurors or at side bar outside their hearing, counsel would present their respective reviews of the nature and effect of the state of the record with respect to the existence of sufficient evidence *aliunde* to justify admission of the testimony, and the court would rule. Ordinarily a ruling in favor of admissibility would constitute a determination by the trial judge that the standard set forth in *Santiago* had been met.[13] In the case at bar the trial judge sufficiently indicated his determination that the *Santiago* requirements had been complied with.

Appellant's argument that there is insufficient evidence to establish a violation of § 1 of the Sherman Act is utterly unmeritorious. The record clearly established collusive allocation of three highway construction contracts.

At the bidding on July 29, 1975, item 25 went to Loitz, who was the only bidder. Azzarelli had agreed to let Loitz have it in reciprocity for a prior contract awarded to Azzarelli several months before. Loitz agreed that Azzarelli (who turned out to be the only bidder) was to get item 26. Loitz also got item 27, on which both Azzarelli and Boettcher submitted high bids, "out of the ball park." Boettcher increased his bid by $1,000,000, and received "payola" of $7500 from Loitz in return for letting the item go to Loitz.[14] The charge of bid-rigging was abundantly proved.

Moreover, there was no possible purpose for appellants' collusion other than to control the allocation of the contracts to the respective collusive bidders. Appellants do not pretend that their price-fixing scheme was engaged in for the ostensible purpose of establishing a "meeting competition defense" under the Robinson-Patman Act, as was contended by defendants in *U. S. v. U. S. Gypsum Co.,* 438 U.S. 422, 454–58, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Appellants' reliance on that case is utterly unper-

---

**13.** This is the practice in the Second Circuit, which follows the *Santiago* standard. *U. S. v. Geaney,* 417 F.2d 1116, 1120 (C.A. 2, 1969). *U. S. v. Ziegler,* 583 F.2d 77, 79–81 (C.A. 2, 1978), was unusual in that the trial judge, although aware of the *Geaney* rule, disregarded it because he disagreed with it. He admitted all declarations offered, leaving entirely to the jury the evaluation of their admissibility, and never at any time making a preliminary determination based on nonhearsay evidence. Hence in *Ziegler* it was impossible to find an implied determination by the trial judge that the standard of admissibility had been met, since he had expressly refused to make the determination required by *Geaney.* See 583 F.2d 80 at n. 5.

**14.** The jury could well have found that Azzarelli's high bid on item 27 was pursuant to collusion (in spite of his denial) since Loitz would hardly have agreed to pay Boettcher to submit a high bid if there were any danger that Azzarelli would submit a low bid on that item. It is of no consequence that Azzarelli may not have known that Boettcher was to receive "payola." All three of the bidders engaged in extensive "wheeling and dealing" in various conversations the day before the bidding.

suasive. Indeed, the conduct of appellants abundantly satisfies the *Gypsum* standard that although criminal offenses under the Sherman Act should be "construed as including intent as an element" [438 U.S. at 443, 98 S.Ct. at 2876], nevertheless "action undertaken with knowledge of its probable consequences and having the requisite anticompetitive effects can be a sufficient predicate for a finding of criminal liability under the antitrust laws." 438 U.S. at 444, 98 S.Ct. at 2877. Clearly the appellants were "consciously behaving in a way the law prohibits." 438 U.S. at 445, 98 S.Ct. at 2877. Their attention was specifically called to the illegality of collusive bidding when they executed affidavits denying the existence of such behavior. It is impossible to infer lack of the requisite intent or *mens rea* in their conduct.

### III—MAIL FRAUD COUNTS

The counts in the indictment dealing with mail fraud also resulted in valid convictions. To prove this charge [15] the Government must establish (1) a scheme to defraud, and (2) use of the mails for the purpose of executing the scheme. *Pereira v. U. S.*, 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435 (1954).[16]

Appellants argue that an antitrust conviction constitutes an exclusive remedy for anticompetitive conduct and precludes prosecution under the mail fraud statute. While under many circumstances a violation of the antitrust laws might occur without involving any fraudulent conduct, there may also be circumstances where fraud is an ingredient of the anticompetitive scheme.

The circumstances of the case at bar, involving collusion to defeat a statutory scheme of competitive bidding prescribed in the public interest by the federal Government and the State of Illinois in order to obtain for taxpayers the lowest possible costs for public works being undertaken, plainly manifest a species of fraud or false representation. This is particularly true where, as here, the bidders were required by law to sign (and did sign) statements that no collusion had been practiced. Under these circumstances appellants' conduct was not only anticompetitive but also fraudulent. Since the two crimes required proof of different facts, conviction of one did not preclude simultaneous conviction for the other. *Gavieres v. U. S.*, 220 U.S. 338, 342–43, 31 S.Ct. 421, 55 L.Ed. 489 (1911); *Carter v. McClaughry*, 183 U.S. 365, 394–95, 22 S.Ct. 181, 46 L.Ed. 236 (1902).

Accordingly, the judgment of the District Court is affirmed.

---

**15.** Violation of 18 U.S.C. 1341.

**16.** It is not necessary that a defendant mail anything himself; it is sufficient if he caused it to be done. "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." 347 U.S. at 8–9, 74 S.Ct. at 363.