UNITED STATES of America, Plaintiff-Appellee,

v.

Louis C. ANDRUS, George E. Collett, William J. Lutson, Billy Ray Whittington, and Larry Thomas Whittington, Defendants-Appellants.

Nos. 82–2403 to 82–2407.

United States Court of Appeals, Seventh Circuit.

Oct. 22, 1985.

John E. Gambill, Rantoul, Ill., Richard Parsons, Peoria, Ill., James M. Murphy, Dallas, Tex., Todd M. Tennant, Dobbins, Fraker, Tennatn, Joy & Perlstein, Champaign, Ill., Michael S. Meza, Cerritos, Cal., for defendants-appellants.

Frances C. Hulin, U.S. Atty's Office, Danville, Ill., for plaintiff-appellee.

Before ESCHBACH and FLAUM, Circuit Judges, and MARSHALL, District Judge.[*]

PRENTICE H. MARSHALL, District Judge.

After a joint three week trial, a jury convicted defendants Louis C. Andrus, George E. Collett, William J. Lutson, Billy Ray Whittington (Bill), and Larry Thomas Whittington (Tom) of conspiring to distribute cocaine in violation of 21 U.S.C. § 846 (1982). Collett was also found guilty of possession of cocaine with intent to distribute and carrying a firearm during the commission of a felony in violation of *id.* § 841(a)(1) and 18 U.S.C. § 924(c)(2) (1982). Simply stated, the government proved that Andrus supplied cocaine to Collett and Lutson who sold it to Tom and Bill Whittington for distribution. None of the defendants testified at trial. The indictment also charged Cathie Becker and Ted Howard as members of the conspiracy. Becker pleaded guilty and testified at trial against the defendants. Howard was a fugitive at the time of trial.

The conspiracy spanned from September, 1981 to January, 1982. In October, 1981 a confidential informant, to whom the government refers as Double X, gave the California Department of Justice information about some of the defendants, which was used to obtain state court authorization to place a transponder on an airplane owned by some of the defendants and used to transport cocaine. Later, in December, 1981, the government enlisted the aid of two other informants, Leland Mansuetti and Karla Mitchell, in its investigation of the case. Mansuetti and Mitchell had participated in the conspiracy until December, 1981. They continued their association with the defendants and later testified at trial against them. They were not indicted.

As appears later, the sufficiency of the evidence is challenged and so we view it in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Karla Mitchell met William Lutson in September, 1980. The following summer, Mitchell met Lee Mansuetti and introduced him to Lutson. Lutson and Mansuetti saw each other regularly, and Lutson hired Mansuetti as a pilot for Lutson and Collett. After September, 1981 Mansuetti flew Mitchell, Collett, and Lutson on numerous trips from California to the midwest to purchase cocaine from Louis Andrus and then flew them back to California to sell the cocaine to Tom and Bill Whittington for distribution.

In September, 1981 Mansuetti flew Mitchell and Lutson from Auburn, California to Kankakee, Illinois in a rented plane. Collett picked them up at the airport in Kankakee. Mansuetti and Mitchell returned to California that day. Collett and Lutson returned to California sometime later. Three or four days later, Mansuetti flew Mitchell, Collett, and Lutson to Porterville, California to deliver twenty ounces of cocaine that Collett had hidden in his boots.

On October 2, Mansuetti flew Mitchell and Collett to Kankakee and on to Paducah, Kentucky. Collett told Mansuetti the trip was "to see Louis and pick up more cocaine from him." Mansuetti flew Mitchell and Collett back to South Lake Tahoe, California where they picked up Lutson. They then flew on to Porterville. There, Collett phoned someone and had the person pick him up at the airport. The group stayed in Porterville only a few hours before flying back to South Lake Tahoe.

[*] The Honorable Prentice H. Marshall, District Judge of the Northern District of Illinois is sitting by designation.

Later in October, 1981 Mansuetti and Mitchell flew back to Porterville. They called Bill Whittington and asked him to pick them up at the airport. Bill and Collett did pick them up and took them to Bill's house. It was on that trip that Mitchell and Mansuetti met Bill. At Bill's house, Collett, Lutson, and a woman sat at the kitchen table. Collett gave Bill some cocaine in exchange for some money. Several people stopped by Bill's house, went to the back room with Bill, and then left.

Around October 12, Mansuetti, Collett, and Lutson purchased a seven person plane that the group used on several trips transporting cocaine.

During the second or third week in October, Mansuetti piloted Lutson, Collett, and Mitchell to Porterville. Bill met them at the airport and took them to his house. Ted Howard, Tom Whittington, and a woman were there. Everyone but Mansuetti sat around the kitchen table snorting cocaine and talking. The people at the table talked about the cocaine business. Bill told Collett that he had lots of buyers for cocaine. Collett responded that he could supply Bill with as much cocaine as Bill would ever need and that he would be willing to front Bill an amount of cocaine equivalent to what Bill actually paid for. Bill introduced Tom to Collett, Lutson, and Mitchell. Bill said that Tom would be taking over the business while Bill was away. Tom did not respond to Bill's statement.

On October 23, Mansuetti flew Collett and Lutson to Sevierville, Kentucky. They picked up some more cocaine from Louie and headed back to California.

In November Mansuetti flew Mitchell, Collett, and Lutson to Boca Raton, Florida. Lutson called Cathie Becker (the defendant who pleaded guilty and testified) in South Lake Tahoe. Becker then flew to Bakersfield. At the Bakersfield airport, she met Ted Howard who gave her a suitcase with $20,000 in cash. Becker flew to Florida where she met Collett, Lutson, Mansuetti, and Mitchell. Becker gave Collett $15,000.

Mansuetti flew Collett, Lutson, Mitchell, and Becker to South Lake Tahoe. They went to Becker's home where Lutson, Collett, and Mansuetti weighed some cocaine and prepared it for delivery. Lutson, Collett, Mitchell, and Mansuetti left for Bakersfield to meet Tom. They checked into a hotel. Tom met them in their room. Lutson and Collett showed Tom some cocaine. Lutson, Collett, and Tom left. A few hours later, they returned to the room with a large sum of money. Mitchell helped Collett count some of the money. She counted $5,000. On two other occasions, Collett, Lutson, Mansuetti, and Mitchell flew to Porterville to meet with Tom at the motel.

Also in November, Mansuetti flew Collett to Detroit, Michigan, where Collett said he picked up nine ounces of cocaine from Louie. Mansuetti flew Collett on to Kankakee, Illinois. After a few days, Mansuetti flew to Denver, picked up Lutson, and returned to Illinois. They stayed at Lutson's house in Dwight, Illinois. Later, Mansuetti flew Lutson to Kankakee where they picked up Collett and flew to Paducah, Kentucky to pick up some more cocaine from Louie.

Mansuetti and Mitchell spent Thanksgiving with Mitchell's family in Texas. They then returned to California. From then on, Mansuetti flew only local flights because Collett and Lutson were short of money and they had trouble making payments on the plane they had earlier purchased. In December, 1981, the man who had sold them the plane agreed to trade a smaller plane for the seven person plane.

On December 5 or 6, Mansuetti and Mitchell were in a motel room in Auburn, California. Two agents of the California Department of Justice, Chuck Jones and Stuart Till, appeared at their door and asked Mansuetti to accompany them to their office. Mansuetti went with them and talked to them. Thus began Mansuetti and Mitchell's cooperation. Mitchell and Mansuetti met with the agents several times after that night. Mansuetti gave them receipts he had saved for gas for the airplane, hotels, and automobile rentals during the time he worked for Collett and Lutson.

On December 15 Lutson and Collett chartered a flight from Rusk Aviation Company in Kankakee to Paducah, Kentucky. Two Kentucky State Police officers watched Collett and Lutson after they left the plane in Paducah. They took a cab to the Holiday Inn. Collett got out of the cab carrying a satchel and walked to a blue car driven by Andrus. He got into Andrus' car, got out of the car, and got back into the cab.

The next day, an officer of the Illinois Division of Criminal Investigation saw Collett and Lutson get off a plane in Kankakee. They drove to a farm owned by a man named Louis Sternberg and drove their car into a metal building on the farm. They then drove to the Alsip Inn where Collett dropped Lutson off.

On January 10, 1982 Mitchell and Mansuetti took undercover agent Wayne Tellis of the California Department of Justice to meet Lutson, who was staying at the Day's Inn in Sacramento. Tellis posed as a person interested in purchasing cocaine. After meeting Lutson, Tellis told Lutson that he wanted three kilograms of cocaine. Tellis and Lutson agreed on a price of $65,000 per kilogram and discussed a sample of the cocaine. Tellis said that he had only enough money for a one ounce sample. Lutson sold Tellis about an ounce of cocaine for $2,300. Tellis and Lutson then talked about the place of delivery for the sale. Tellis said that he wanted the cocaine in California, but Lutson said only one kilogram could be delivered there. Lutson said he would talk to his partner that afternoon about the delivery. Tellis, Mansuetti, and Mitchell then left Lutson's room for Tellis' office. There, Tellis weighed the sample he had purchased from Lutson. It weighed less than one ounce.

Later the same afternoon, Tellis, Mansuetti, and Mitchell returned to Lutson's room. Lutson let them in. The phone in the room was off the hook. Lutson told Tellis his partner wanted Tellis to come to Florida to pick up the cocaine. Lutson gave Tellis the phone. Collett was on the other end of the line. Tellis told Collett that he was afraid to come to Florida with so much money. Collett said the operation was set up "back here" and that the product would have to be "muled" or transported up north. After some dispute about the place of delivery, Tellis told Collett he was willing to pay $65,000 per kilogram. Collett told Tellis that mule charges to bring the product north would be $50 per ounce. Tellis responded that he would pay $25 per ounce. After the phone call, Tellis told Lutson that the sample had been under an ounce. Tellis had brought a scale. He poured the sample on the scale and Lutson added to the sample until the scale read one ounce. Tellis put the powder in a plastic bag. Tellis, Mansuetti, and Mitchell returned to Tellis' office. There, Tellis received a phone call from Collett on an undercover telephone line regarding the transaction.

Later that afternoon Mitchell and Mansuetti returned to Lutson's room. Lutson told Mansuetti and Mitchell to sell the three ounces that remained after Tellis had taken the sample. He suggested that they contact Tom in Bakersfield, but that they not tell Tom that the cocaine was from Lutson. At about seven that night, Mansuetti called Tom from a pay phone in Sacramento. Mansuetti then chartered a plane to fly to Bakersfield. Mansuetti and Mitchell arrived in Bakersfield at about 1 a.m. Mansuetti called Tom. Tom picked them up and drove about a quarter of a mile to a 7–11 store. In the parking lot Tom gave Mansuetti $6,000, and Mansuetti gave Tom the cocaine. Mansuetti and Mitchell returned to South Lake Tahoe early in the morning of January 13.

Later on January 13, Tellis met with Lutson at the Day's Inn. Tellis gave Lutson $5,450. Lutson told Tellis that he had made arrangements with Mansuetti and Mitchell to take care of the remaining cocaine. Tellis drove Lutson to the Sacramento airport. On the way, they talked about Lutson's cocaine business. Lutson said that Collett was his partner. According to Lutson, both he and Collett had their own suppliers, but Collett was setting up

this deal through his source in Paducah. Collett's supplier owned a trucking business, so he could move the cocaine, but not all the way to California.

Meanwhile, Stuart Till, the agent who had first contacted Mansuetti and Mitchell, picked up Mansuetti. Till and Mansuetti flew to Champaign, Illinois on January 12, 1982. Till posed as Tellis' partner. Till and Mansuetti checked into a room at the Holiday Inn. At about 11 a.m., Till telephoned Collett and identified himself as Tellis' partner. Collett told Till that he had talked to "his man" the day before. Collett said that he and "his man" talked every day around 5 p.m. Early the same afternoon Till called Collett again to ask about the progress of the deal. Collett said his partner would be returning to Illinois sometime that evening.

Shortly before 6 p.m. Till again called Collett. Collett said that it was too late for delivery, so delivery would have to take place the next day. Collett said he did not like to do business at night and asked Till to check on getting a plane.

Around 9 a.m. on January 14, Till called Collett to check out the deal. Collett told Till that the product was being driven up from Florida, and that it was then in Chattanooga, Tennessee. Severe snowstorms had caused delays in transporting the product. Collett said his source was a fifty-eight year old man who was involved in real estate and the jewelry business and was in partnership with his son. Collett told Till that he would need to charter a flight south from Champaign and then back to Champaign. Till could sample the product then, Collett told Till. Collett also said that Till would not have to front any money. About an hour later, Collett called Till and asked how much Tellis had bought in California as a sample. Till said an ounce.

The next morning, after a few phone calls between Collett and Till, Till and Mansuetti met Collett in the hotel lobby. The three returned to Till's hotel room. Collett took a .44 caliber gun from his trousers. Collett said he had made arrangements for

the three to fly to Paducah, Kentucky to pick up the cocaine and that Mansuetti would pilot the plane. Till told Collett that Collett would have to go alone because Till wanted to stay behind with the money. Collett ripped a page of paper from a small notebook and said that he was going to call his answering service. He left the room for about five minutes. Collett told Till that his partner had helped him with drug deals in the past including travel in Florida, Kentucky, and Illinois.

Collett left to get something to eat at the hotel restaurant. Mansuetti followed Collett to the restaurant. He found Collett and Lutson having lunch. Mansuetti talked with them for one or two minutes and returned to the room.

Collett came back to the room and asked if there had been any phone calls. He left for about a minute to call his answering service. After Collett had returned to the room, the phone rang. Collett answered and said, "I've been trying to get ahold of you." Collett told the person on the phone that he had seen the $200,000. When Collett got off the phone, he said he had just spoken to Louie, who had been his source for years. According to Collett, Louie lived in Paducah and would front him up to a kilogram of cocaine. At about 6:30 p.m. Collett left.

Collett later called Till at the Holiday Inn and told Till that he had problems with the landing gear and Till should call Paducah and say the flight would be forty-five minutes late. Collett flew to Paducah and back to Champaign via Midstate Aviation. He paid for the flight in cash. He told the pilot that his name was Lee Mansuetti, but at the trial the pilot identified Collett as his passenger.

Till called the Paducah airport and informed the air control specialist there that if anyone called inquiring about Collett, they should be told that Collett would arrive an hour late due to engine problems. About half an hour after the call, Andrus came to the Paducah airport. The air control specialist asked if he was looking for Collett. Andrus said, "yes," and was told

that Collett would be an hour late. While he was waiting for Collett to arrive, Andrus went to rent a car at the airport. He went to the Avis booth and asked to rent the cheapest car available. The clerk at the Avis booth referred him to the Hertz booth because she knew Hertz had an available Chevette. Andrus attempted to rent the car. He gave the Hertz clerk his VISA card, which bore the name "Louis Andrus." The clerk called in the card number, and it was rejected. An officer of the Kentucky State Police saw a car traced to Louis Andrus' residence circling the airport parking lot that night.

When Collett arrived back in Champaign late that night, the Champaign police arrested him. The police removed the gun from his belt and advised him of his rights to remain silent and to counsel pursuant to *Miranda v. Arizona,* 384 U.S. 436, 471–72, 86 S.Ct. 1602, 1626–27, 16 L.Ed.2d 694 (1966). Collett said he understood his rights, and wished to cooperate. The police asked him if the briefcase he carried belonged to him. He answered that it did. Collett also said, "I always said if I ever got caught doing this, I was going to do what was necessary to help myself and my family." An officer asked him where the keys to the briefcase were, and Collett said he had them. The police took various items from him, including his keys, some money, and a small piece of paper with some phone numbers on it. The officer asked Collett what was in the briefcase, and Collett replied "a kilo." The officer asked "A kilo of what?" Collett answered, "cocaine."

After Collett was booked, he was taken to a room for questioning. The police repeated the *Miranda* admonitions, and Collett stated that he wished to cooperate. At that point, the federal prosecutor who prosecuted the case came into the room. The prosecutor agreed that if Collett led them to his source the next day, the prosecutor would recommend a sentence of ten years. Collett persisted in his wish to cooperate. He then made a statement.

We turn to the numerous assignments of error urged by the defendants in multiple briefs.

## A. Coconspirators' declarations

Substantial evidence against the defendants consisted of out of court declarations of Lutson, Collett, and Bill Whittington, which the trial court ruled admissible under Fed.R.Evid. 801(d)(2)(E) which excludes from the definition of hearsay "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Before trial, the court determined that it was more likely than not that Andrus, Collett, and Lutson were participants in a conspiracy, but that the government had failed to show that the Whittingtons were members of the conspiracy. However, during the government's case in chief, the court ruled that it was more likely than not that Bill and Tom Whittington were members of the conspiracy. All defendants object to the procedures the court employed in determining whether the declarations of Lutson, Collett and Bill Whittington were admissible under Fed.R. Evid. 801(d)(2)(E).

*United States v. Santiago,* 582 F.2d 1128, 1134 (7th Cir.1978) established the standard in this circuit for admission of statements under rule 801(d)(2)(E). There, this court held that " 'if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible.' " *Id.* at 1134 (quoting *United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir.1977)).

Defendants Andrus, Collett, and Lutson object to the trial court's preliminary determination of their membership in the conspiracy. Prior to trial, the court held a hearing to determine whether to admit the statements under rule 801(d)(2)(E). The only witnesses to testify at the hearing were Agent Willis, an officer of the Illinois Division of Criminal Investigation, and Agent Till. The court also read a transcript of Mansuetti's grand jury testimony.

At the time of the pretrial hearing, both Mitchell and Mansuetti were in Danville, where the hearing took place, yet the government called neither to testify. Defendants Andrus, Collett, and Lutson argue that the use of Mansuetti's grand jury testimony violated their sixth amendment right of confrontation and was an inadequate basis upon which to make a finding under rule 801(d)(2)(E).

■ The sixth amendment to the United States Constitution provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." The confrontation right applies at trial. "The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness." *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968); *see also Gerstein v. Pugh*, 420 U.S. 103, 121–22, 95 S.Ct. 854, 866–67, 43 L.Ed.2d 54 (1975) (confrontation a formality and safeguard designed for trial). The right to confrontation applies when the ability to confront witnesses is most important—when the trier of fact determines the ultimate issue of fact. Consequently, the sixth amendment does not provide a confrontation right at a preliminary hearing, *United States v. Harris*, 458 F.2d 670, 677–78 (5th Cir.), *cert. denied*, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972). Similarly, the accused does not have a confrontation right at an in chambers hearing to determine the reason a witness had refused to answer a question. *LaChappelle v. Moran*, 699 F.2d 560, 564–65 (1st Cir.1983).

■ A hearing to determine whether statements are admissible under rule 801(d)(2)(E) does not take place before the jury, nor does it determine the guilt of the defendant. Granted, the conspiracy issue with which the trial judge is faced overlaps with that which confronts the jury. But the court's determination is not—indeed, must not be—communicated to the jury. Moreover, the court may reconsider its determination at the close of the evidence at trial which has been subjected to confrontation and cross-examination. *United States v. Coe*, 718 F.2d 830, 837 (7th Cir.1983). Therefore, given the limited purpose of a court's pretrial determination under *Santiago*, the sixth amendment does not provide a right to confrontation at that time.

■ Even though the admission of out of court statements at a pretrial hearing may not violate the confrontation clause, the statements may still be an impermissible basis upon which to find the coconspirator's declarations admissible. To offer the coconspirator's declarations at trial, the government must prove by a preponderance of the evidence that a conspiracy existed, that both the defendant and the declarant were members of the conspiracy, and that the declarant made the statement in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134. The government's evidence must not be hearsay and must be independent of the statements sought to be admitted. *United States v. Jefferson*, 714 F.2d 689, 696 (7th Cir.1983).

■ *United States v. Azzarelli Construction Co.*, 612 F.2d 292 (7th Cir.1979), *cert. denied*, 447 U.S. 920, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980) recognized the procedure generally used to determine the admissibility of a coconspirator's declarations under Fed.R.Evid. 801(d)(2)(E):

The normal practice, it would seem, would be for a defendant to object at the time the challenged statement is offered. Thereupon, either during a recess granted the jurors or at side bar outside their hearing, counsel would present their respective reviews of the nature and effect of the state of the record with respect to the existence of sufficient evidence *aliunde* to justify admission of the testimony, and the court would rule.

*Id.* at 297. Once the court determines the probable existence of the conspiracy and the participation by the defendant and the declarant, the defendant may still move the court to reconsider after presentation of all the evidence. The ultimate finding of a statement made in furtherance of a con-

spiracy for purposes of rule 801(d)(2)(E) must be based on all the evidence admitted at trial. *Coe,* 718 F.2d at 837.

■ The procedure approved in *Azzarelli Construction* is not the only acceptable means of making the *Santiago* determination. In a case such as this one, where the evidence to establish the conspiracy is voluminous, the *Azzarelli Construction* procedure would be impracticable. To interrupt a jury trial for such a presentation would be inefficient. In such circumstances the trial court has two alternatives.

It can admit the statements subject to the government's eventual proof by a preponderance of the evidence of the elements required under rule 801(d)(2)(E). If the government fails its burden, the court will either declare a mistrial or issue an appropriate limiting instruction, depending on the degree of damage done by the declarations admitted. *Coe,* 718 F.2d at 837.

Alternatively, the court can require the government to make a preliminary showing of its proof on the declarations and the conspiracy from which the court can determine whether the government will satisfy its burden under *Santiago.* The court may require the government to come forth with its proof on the conspiracy issue. Such a procedure will result in a duplication of efforts, however, for the same proof will most likely be offered at trial. Furthermore, because the *Santiago* determination is subject to change during the trial, holding a full blown pretrial hearing for a decision which is not final is an inefficient means of resolving the issue.

■ Consequently, the court also has the option of requiring the government to present a proffer of the proof on the declarations and conspiracy that it will offer at trial. The court can then decide whether, if the government proves what it has proffered, the requirements of *Santiago* will be met. The latter procedure has the advantage of economy. Witnesses will not have to be brought in twice. The court will not spend an excessive amount of time making a determination which is only preliminary.

■ In the instant case, the court followed a procedure similar to the latter. The evidence produced at the *Santiago* hearing would not all have been admissible at trial. Mansuetti's grand jury testimony was hearsay that did not fall into any hearsay exception. But the substance of Mansuetti's trial testimony, which was heavily cross examined, was the content equivalent of his testimony before the grand jury. All the evidence presented at the *Santiago* hearing was repeated at trial in admissible form.

Had the trial court merely required the government to submit a proffer of its declaration/conspiracy evidence, the court would have reached the same result. The government would have shown how Mansuetti, Till, and Willis would testify at the trial. To substantiate its showing on Mansuetti's testimony, the government would have offered the transcripts from the grand jury. The government's proffer would have contained the same information, albeit in a different form, that the government showed at the pretrial hearing. Given the same information, the court would have reached the same conclusion: that it was more likely than not that Andrus, Collett, and Lutson were participants in the conspiracy.

Tom and Bill also complain about the trial court's determination that coconspirator statements were admissible against them pursuant to rule 801(d)(2)(E). During the in trial direct examination of Karla Mitchell, the court found that it was more likely than not that the Whittingtons were members of the conspiracy. At the point that the court made its ruling, twenty-five witnesses had testified. Of those twenty-five, four—Till, the undercover agent who met with Collett in Champaign; Tellis, the undercover agent who met with Lutson in Sacramento; Mansuetti, the informant; and Becker, the defendant who pleaded guilty—testified about statements made by Collett and/or Lutson which the court admitted under rule 801(d)(2)(E). Immediately before or after a particular witness testified about a statement, the court instructed

the jury that it could be considered only against Andrus, Collett, and Lutson, and not against Bill or Tom Whittington. When the court held that Mitchell's testimony had established by a preponderance of the evidence that Bill and Tom Whittington were members of the conspiracy, the government moved to have the court instruct the jury that the statements testified to earlier in the case could be considered against all the defendants. The court denied the motion:

> I deny the Government's motion to instruct the jury that they are now to consider all evidence which was admitted for a limited purpose generally. I do that on the basis that at the time of offering the evidence, the Government had the burden of persuading me that it was more likely true than not that the two Whittingtons were co-conspirators, and the Government failed in that burden of persuasion, and offered the evidence.

Bill and Tom Whittington argue that the court's re-evaluation of the *Santiago* determination was improper. The government was aware of Karla Mitchell's testimony when the pretrial hearing was held, yet the government chose not to include Mitchell's testimony in its submission. Bill and Tom argue that they should not be prejudiced by the government's tactical decision. They claim that they were prejudiced because when the first twenty-five witnesses testified, the Whittingtons had no incentive to cross-examine them. In addition, Tom argues that Mitchell's testimony was an insufficient basis for the determination that he was more likely than not a member of the conspiracy.

The court considered Karla Mitchell's testimony on two events that occurred in October, 1981 in making its co-conspirator ruling as to Bill and Tom. First, Mitchell stated that she and Mansuetti had gone to Bill's home with Collett and Lutson. There, Collett had exchanged a white substance for some money. Bill took the white powder to the bathroom. Later that afternoon, several people stopped by and went into Bill's back room with him and left. A few weeks later, Mitchell testified, she, Mansuetti, Collett, and Lutson again went to Bill's house. All except Mansuetti sat around the kitchen table talking. Mitchell testified:

A: We sat around the table, just talking. We snorted coke. Talking business.

Q: What, if anything was said at that table?

A: We were talking business, about coke, and how much Bill Whittington told George Collett and Bill Lutson that he had lots of buyers for coke and that as much as George Collett and Bill Lutson could supply him with, he would get rid of and he would have the cash for it.

. . . . .

Q: Was anything else said?

A: Yes. George Collett then said that as much money that he paid for coke, he could get the same amount fronted to him.

Q: All right. And after that?

A: At the moment, I can't think of—except that Bill Whittington told him, "We can do business."

Q: Was there any statement made with reference to Tom Whittington by anyone?

A: Yes, there was, Bill Whittington had introduced George Collett, myself, Lee, Bill Lutson to Tom, telling us that he would be taking over things for him, that he would be going away.

Q: Who is going away?

A: Bill Whittington would be going away.

Q: Who would be taking over?

A: Tom Whittington.

Q: And where was Tom Whittington at this time?

A: He was sitting there at the table.

The trial court considered Tom's acquiescence in Bill's statements as Tom's adoptive admission in making the coconspirator ruling.

After the court made the coconspirator finding as to Tom and Bill, Tom's attorney expressed concern that the reconsideration would prejudice his client.

> Well, just that it prejudices the defense. I will go over my notes tonight to determine which witnesses I would handle differently and which witnesses I would ask questions of, as I chose not to, in the area of....

The court interrupted Tom's counsel to say that a motion to recall the witnesses would be considered. Tom's counsel then moved for a mistrial which the court denied. Neither Tom's counsel nor Bill's counsel ever requested that any witness be recalled during the government's case.

■ The four witnesses who testified as to coconspirators' declarations were Agents Tellis and Till and Mansuetti and Becker. Tellis testified that both Lutson and Collett had made various statements negotiating the price, place of delivery, and quantity of the cocaine deal. Till testified to statements made by Collett in the hotel room in Champaign. The trial court interpreted Collett's handling of his gun as a statement in furtherance of the conspiracy. Mansuetti testified about numerous statements by Lutson and Collett throughout the course of the conspiracy. Of those four, only Mansuetti mentioned Tom. None of the four mentioned Bill. Mansuetti testified about the three ounce sale of cocaine to Tom. Mansuetti also said Tom had come to his hotel room in Bakersfield twice in November, 1981. Tom's counsel cross-examined Mansuetti.

Three of the four witnesses were recalled by defendants. Collett and Lutson called Mansuetti. Lutson called Till and Becker. Bill and Tom's attorneys did not question these three witnesses when they appeared in the defendants' cases.

In addition to the four witnesses who testified as to coconspirators' declarations, twenty-one other witnesses testified before the court made its coconspirator ruling as to Bill and Tom. Not one of those witnesses mentioned Tom or Bill Whittington. Accordingly, it is unlikely that either defendant suffered prejudice by not having cross-examined the witnesses. Neither counsel for Bill or Tom asked to recall any of those witnesses. Nor did they present the trial court or us with any questions they would have asked those witnesses had they known that the trial court would rule that coconspirators' declarations would be admitted against them.

■ Tom argues that not only was the timing of the ruling unfair, but also that the evidence underlying the determination was insufficient to support the conclusion that it was more likely than not that Tom was a member of the conspiracy. When the court made its ruling as to Tom, the only evidence against Tom was Mitchell's testimony that Tom acquiesced in Bill's statement that Tom would be taking over the business.

Tom argues that Bill's statement that Tom would be taking over the business was hearsay, and that, therefore, the court should not have considered it in making the coconspirator determination. The trial court, however, ruled that the statement was not hearsay and was admissible against Tom under rule 801(d)(2)(B) which provides that a statement is not hearsay if it is offered against a party and is "a statement of which [the party] has manifested his adoption or belief in its truth." The trial court determined that Tom's silence was an adoptive admission, and therefore, fell within rule 801(d)(2)(B). The trial court had a reasonable basis from which to conclude that Tom heard and understood Bill's statement, for both Tom and Bill were sitting around a table when the statement was made. Immediately before the statement was made, Bill had been talking to Collett about obtaining cocaine and using cocaine, so the court could reasonably conclude that the business to which Bill referred was the cocaine distribution business. The trial court's decision to use the silence in its coconspirator ruling was supported:

> I base [the *Santiago* determination as to Tom] upon the testimony by the wit-

ness Mitchell that in the conversations that ensued around the table in the home of Billy Ray Whittington which she has described, that the admission, the statement was made by Billy Ray Whittington that he would turn his business over, his business of distributing cocaine—that was implied, I agree that it wasn't said specifically, but I reasonably infer that was the only business they were talking about, that he would turn that business over to Larry Thomas Whittington, and that I interpret Larry Thomas Whittington's silence under the circumstances as an admission under Rule 801(d)(2)(B), that is, he adopted the statement of Billy Ray Whittington.

■ The standard of review of a determination that a statement is admissible as a coconspirator's declaration is the clearly erroneous standard. *United States v. Williams*, 737 F.2d 594, 609 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). The trial court's conclusion that Tom was more likely than not a member of the conspiracy was not clearly erroneous.

From the foregoing we conclude that the trial judge ruled correctly on the issue of the admissibility of coconspirator declarations, that he handled the issue in a fair and even handed manner and that the defendants have shown no prejudice with regard to the issue.

## B. Single conspiracy

All defendants argue that while the indictment alleged one conspiracy, the government proved multiple conspiracies. According to the defendants, the government proved four separate conspiracies: a conspiracy among Collett, Lutson, and Andrus; a conspiracy between Mansuetti and Mitchell before September, 1981; a conspiracy between Mansuetti and Mitchell to sell Tom Whittington three ounces of cocaine on January 11, 1982; and a conspiracy between Collett, Lutson, and Louis Sternberg in November, 1981.

■ If the defendants "knowingly embraced a common criminal objective," then a single conspiracy is proved. *United States v. Ras*, 713 F.2d 311, 314 (7th Cir. 1983). In *Ras* one defendant stole securities and gave them to a second defendant to negotiate them. The second defendant contacted the remaining defendants, who negotiated the stolen securities. The court held that a single conspiracy had been proved. That each defendant did not know of each other defendant's identity was insignificant, as long as they knew of each other's existence. Moreover, each defendant need not have participated in each transaction. All defendants shared the common goal of converting the securities into cash.

■ The instant case compares with *Ras.* Andrus provided cocaine to Collett and Lutson, who sold it to Tom and Bill, who intended to distribute it. Andrus knew that he was selling cocaine to Lutson and Collett and that the success of the venture depended upon Lutson and Collett being able to sell the cocaine to someone who would distribute it. Tom and Bill knew when they purchased the cocaine that Collett and Lutson had obtained the illegal substance from a supplier. The circumstances of this case present the classic chain conspiracy. On the one end of the chain, Andrus supplied cocaine to Collett and Lutson, who distributed it to Tom and Bill on the other end of the chain. In *United States v. Agueci*, 310 F.2d 817 (2d Cir.1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963), the court explained the reasoning underlying the recognition of a chain as a single conspiracy:

An individual associating himself with a "chain" conspiracy knows that it has a "scope" and that for its success it requires an organization wider than may be disclosed by his personal participation. Merely because the Government in this case did not show that each defendant knew each and every conspirator and every step taken by them did not place the complaining appellants outside the scope of the single conspiracy.

*Id.* at 827. When, as here, the allegations concern transactions involving narcotics, each conspirator must appreciate the existence of others along the distribution chain. *Id.*

The circumstances of this case demonstrate the existence of a single conspiracy. The presence of Louis Sternberg on a few occasions does not multiply the number of conspiracies involved. Nor does Mansuetti's and Mitchell's previous involvement in drug dealing mean there were multiple conspiracies. Further, the sale by Mansuetti and Mitchell did not constitute a separate conspiracy.

## C. Discovery requests

The defendants complain that the government's failure to provide them with certain requested information and the trial court's refusal to order the government to provide the information deprived them of their right to a fair trial. All defendants assert that the court should have ordered the government to disclose the identity of a confidential informant who supplied information for an application to implant a transponder in defendants' plane. Defendant Andrus argues that the court should have required the government to produce the personnel files of the law enforcement officers who testified at trial.

### 1. The identity of Double X

Double X is a confidential informant who supplied agents of the California Department of Justice information about the activities of Mansuetti, Mitchell, Lutson, and a person named "George," whose last name was then unknown. Agent Till used that information in an affidavit seeking authorization to plant a transponder on the defendants' plane. According to the affidavit, Double X told Till that Lutson, Mansuetti, and Mitchell had distributed large amounts of cocaine and methaquaalone since June, 1981. Lutson, Mansuetti, Mitchell, and "George" purchased a plane to transport the drugs. "George" financed the purchases of the substances and Lutson, Mansuetti, and Mitchell transported

the substances. The affidavit also stated that on October 21, 1981 Double X met with Mansuetti. Agent Jones monitored the conversation with an electronic device. During that conversation, Mansuetti told Double X about the purchase of the plane. He also told Double X that he was to fly Lutson to the Chicago area to pick up some cocaine around October 24. Mansuetti would pose as a charter pilot, and the cocaine would be in a locked briefcase. If the authorities caught him, he could act as if he did not know the briefcase contained cocaine.

Defendants contend that Double X's identity was essential to their defense. Knowledge of the identity of Double X would have enabled the defendants to impeach Mansuetti and Mitchell as to the extent of their participation in the conspiracy and as to bias which would cause them to testify falsely against the defendants. Moreover, Double X may have provided proof of Lutson's and Collett's entrapment defenses and of a separate conspiracy in which Mansuetti and Mitchell were involved during the same time as the charged conspiracy.

In *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court held that the government's refusal to provide the defendant with the name of a confidential informant who "had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged" infringed the defendant's right to due process of law. *Id.* at 55, 77 S.Ct. at 625. To determine whether the government is required to disclose the identity of the informant, the court must balance the public interest in obtaining information necessary to apprehend those who have committed crimes against the defendant's interest in a fair trial. "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the

crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62, 77 S.Ct. at 629. This court has held that *Roviaro* implied that the defendant must establish a genuine need for disclosure before disclosure should be ordered. *United States v. Tucker*, 552 F.2d 202, 209 (7th Cir.1977). When the informant is a mere "tipster," rather than a participant or an eye witness to the event in question, disclosure will not be required. *United States v. Lewis*, 671 F.2d 1025, 1027 (7th Cir.1982).

■ Here, defendants learned of Double X's existence when the government disclosed Agent Till's affidavit for the transponder. On numerous occasions before and during trial, the defendants asked the government to tell them Double X's identity. The government provided the trial judge with a transcript of their interview with Double X and a memorandum detailing information Double X gave them. After reviewing this submission, the court questioned Till in camera. None of the attorneys were present during this hearing, but a court reporter transcribed it.

Double X provided information which instigated the investigation into defendants' activities. Double X was not, however, present at any of the transactions alleged in the indictment or proved at trial. Double X's information was used solely to obtain authorization to put a transponder on defendants' airplane. In *United States v. Manley*, 632 F.2d 978 (2d Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981), the defendants sought the name of a confidential informant who had provided information for obtaining a warrant. The court denied the request, stating, "The data provided by the informants in this case related solely to the issue of justification for attempting to execute the arrest warrant, a matter even more remote from a defense on the merits than the usual search and seizure controversy, and light years away from the question of guilt or innocence." *Id.* at 985. Similarly, here, Double X could not have

provided information relevant to the issue of guilt or innocence, for the informant was not present at the events forming the basis of the conviction.

Considering the *Roviaro* factors, it is clear that the court correctly denied disclosure. First, a court must consider the offense charged and possible defenses. The asserted defenses here were that the government entrapped the defendants and that the government proved multiple conspiracies rather than a single conspiracy. Double X could not have provided proof that any of the defendants were entrapped. Double X's knowledge about the defendants' activities preceded the government's involvement in the case. Further, whether Double X could have provided information about other conspiracies is not relevant to the issue of the defendants' guilt.

The sole possible value of Double X's testimony to the defendants would have been to implicate Mansuetti and Mitchell as persons who were involved in the distribution of cocaine and methaquaalone. Mansuetti himself admitted that he had once been a heavy user of cocaine and had participated in numerous purchases and sales of large quantities of cocaine. Like Mansuetti, Mitchell conceded that she had used cocaine frequently and that she had been involved in several cocaine transactions. Consequently, the informant would merely have provided cumulative information.

Defendants knew the identities of the persons who were present during the transactions in question. Mansuetti and Mitchell both identified all the other persons who were present at the transactions to which they testified. Neither of the defenses asserted nor the value to the defendants of Double X's testimony warranted disclosure of Double X's identity. Because the defendants did not show a genuine need for the identity of the informant, the trial court correctly denied their motion for disclosure.

### 2. *Discovery of impeaching material*

■ Related to the issue on Double X's identity is Andrus' claim that the trial court should have granted his discovery requests

for impeaching material on the law enforcement officers who testified against defendants. Andrus argues that he should have had access to material from the witnesses' personnel files which might have been impeaching. Andrus moved for an order requiring the government to produce personnel files for all law enforcement witnesses, and the trial court denied the motion. Andrus asserts that the denial of his motion violated the rule enunciated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In *Brady,* the Supreme Court held that the failure of the prosecution to turn over to the defendant evidence favorable to the defendant on the issue of guilt violates due process. *Id.* at 87, 83 S.Ct. at 1196. Included among the evidence that Brady obligated the prosecution to disclose is "evidence affecting credibility." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Andrus therefore asserts that the personnel files on the witnesses fell within the class of material *Brady* required the government to produce.

Andrus concedes that there is no suggestion that the personnel files actually contained information which was impeaching. Andrus argues that the government should nevertheless have been required to produce the records.

In *United States v. Navarro,* 737 F.2d 625 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984) this court rejected an argument similar to Andrus'. There, the defendant had sought the production of Immigration and Naturalization Service files on a particular witness who testified at trial. The defendant asserted that the files may have contained material the defendant could use to impeach the witness, such as an undisclosed cooperation agreement between the government and the witness. The defendant argued that the trial court's refusal to order the government to turn over the file or to produce the file for an in camera inspection violated his right to confrontation of witnesses and due process of the

law. The court held that the speculative assertion that impeaching material may be in a government file did not warrant an order to disclose the contents of the file or to produce the file for the court's inspection.

> Mere speculation that a government file may contain *Brady* material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial. A due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the district court.

*Id.* at 631. Andrus was not entitled to the personnel files of the law enforcement witnesses without even a hint that impeaching material was contained therein.

### 3. Andrus' motion for bill of particulars

■ Andrus argues that the trial court's denial of his motion for a bill of particulars prejudiced the preparation of his defense. Under Fed.R.Crim.P. 7(f), the trial judge has discretion to grant or deny a request for a bill of particulars. Only when the trial court clearly abuses its discretion should the court of appeals reverse. *United States v. Johnson,* 504 F.2d 622, 627 (7th Cir.1974). Such an abuse requires that the defendant suffer prejudice from the denial of the request. *Id.* at 628. If the indictment contains sufficient information to inform the defendant of the nature of the charges against him, and the government provides the defendant with information about the alleged overt acts and coconspirators prior to trial, the defendant has not suffered prejudice from the refusal of the request. Further, if the defendant could, from reading the indictment, reasonably anticipate the evidence to be introduced at trial, the denial of the motion does not prejudice the defendant. *Id.*

■ The indictment spells out Andrus' involvement in the conspiracy with particularity. It specifically alleges trips to Detroit and Paducah where Andrus supplied Collett with cocaine and the dates on which Collett made the trips. Further, the indict-

ment alleges Andrus' phone call to Collett in Champaign the night of Collett's arrest. It states the dates and times of the remaining defendants' actions in furtherance of the conspiracy. The denial of the motion for a bill of particulars did not prejudice the preparation of Andrus' defense. The trial court did not abuse its discretion in denying his request.

### D. Execution of search warrant for Tom Whittington's house

Tom Whittington contends that the execution of the search warrant for his home violated 18 U.S.C. § 3109, and that, therefore, the trial court should have suppressed the evidence seized in the search. Tom and the government stipulated that the issue of the search be resolved on the basis of the police report of the search.

According to the police report, a judge of Kern County, California issued a search warrant for Tom Whittington's home on January 14, 1982. At about 9:45 that evening, officers of the Bakersfield Police Department and the California Department of Justice arrived at Tom's home. The lights in the house were on. The police knocked on the door and announced that they were there to execute the warrant. Twenty seconds later, after receiving no response, the police again knocked on the door and announced their purpose. Another fifteen seconds passed without response. Once again, the police knocked and announced that they were there to enforce the warrant. At that time, they knocked down the door and entered Tom's house. Inside the house were Tom's wife, his daughter, and his daughter's friend. During the search of the home, the police found some plastic bags of cocaine, a scale, and a notebook used to keep records of drug transactions.

▆▆▆ Tom argues that the break in violated 18 U.S.C. § 3109, which states:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

Section 3109 regulates execution of a federal warrant by federal officers, but does not govern the conduct of state or local police officers executing state warrants. *United States v. Valenzuela*, 596 F.2d 824 (9th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979). Here, a state judge issued the warrant and officers of a local police department and the state justice department executed the warrant. Consequently, § 3109 does not directly govern the officers' conduct. The fourth amendment, however, embraces the principles of § 3109. *Valenzuela*, 596 F.2d at 830. Through the fourteenth amendment, the fourth amendment requires that the state officers' conduct in enforcing a search warrant be reasonable. *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). In addition to the requirements of the fourth amendment the officers were governed by a California statute, which is almost identical to the federal law. It provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.

Cal.Penal Code § 1531 (West 1970). Evidence seized by a state law enforcement officer in violation of the United States Constitution may not be used in a federal prosecution. *Elkins v. United States*, 364 U.S. 206, 223-24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960). Because the California statute provides a standard equivalent to the federal standard, we need not decide whether evidence seized by state officers in violation of state law may be used in a federal prosecution.

▆▆▆ The trial court correctly denied the motion to suppress, for the conduct of the officers comported with constitutional requirements. Three times the officers announced their authority. Since the lights inside the house were on, it was reasonable for the officers to conclude that someone

was at home. When no one responded to knocks and announcements, it was reasonable for the police to break down the door.

## E. Collett's statement to the police

Collett argues that he entered into a plea agreement under which the government agreed to recommend a sentence of ten years in return for his cooperation with the investigation and that the government breached its promise to him. He asserts, therefore, that he is entitled to specific enforcement of that promise or suppression of the statements made in reliance upon the government's representation.

Upon arresting Collett, the Champaign, Illinois police officers advised him of his rights under *Miranda v. Arizona*. Collett indicated that he understood his rights, but wished to cooperate. In response to questions from the police, Collett informed the police that his briefcase contained a kilogram of cocaine. The police then took him to the Champaign police department. He told the police about his source. At some point in the conversation, Collett told the police that he wanted to cooperate and asked what could be done for him. The prosecutor assigned to the case was in the building at the time. She came into the interrogation room briefly and told Collett that if he led them to his source that day and if he took a phone call at the station from Andrus, she would recommend a sentence of ten years. Collett took the phone call from Andrus at the station. The morning after his arrest, Collett went with federal agents to Effingham, Illinois to assist the government in Andrus' arrest. The government was unable to arrest Andrus that day. At the sentencing hearing, the government recommended that the court sentence Collett to twenty years.

Collett argues that *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971) requires specific enforcement of the government's promise. *Santobello* held that when the government makes promises to a defendant who relies on those promises and pleads guilty, the government must carry out its representa-

tions. *Id.* at 262, 92 S.Ct. at 498. In this case, Collett did not plead guilty, so the facts here are not governed by *Santobello*. However, many courts have acknowledged that the principles of *Santobello* apply whenever a defendant acts to his detriment in reliance upon governmental promises. *See, e.g., Rowe v. Griffin*, 676 F.2d 524 (11th Cir.1982) (holding prosecutor must fulfill promise of immunity in return for defendant's self incriminating testimony at another trial); *United States v. Rodman*, 519 F.2d 1058 (1st Cir.1975) (requiring dismissal of indictment when SEC breached agreement to make no prosecution recommendation to United States Attorney in return for defendant's cooperation); *United States v. Wolf*, 601 F.Supp. 435 (N.D.Ill. 1984) (requiring suppression of statements made to Canadian Revenue agents in return for promise that evidence would not be turned over to United States Internal Revenue agents); and *United States v. Sanderson*, 498 F.Supp. 273 (M.D.Fla.1980) (requiring dismissal when government agreed not to seek indictment in return for cooperation in counterfeiting investigation).

██ In the instant case, however, the government did not seek to use the contents of statements made by Collett in return for the government's promise to recommend a ten year sentence. The trial court held a pretrial hearing on the admissibility of Collett's statements. Agents Willis and Waldrup of the Illinois Department of Law Enforcement and Agent Kildow of the Drug Enforcement Administration, all of whom had been present when Collett was arrested at the airport and questioned at the police station, testified about Collett's statements. After hearing their uncontradicted testimony, the court held that Collett had made the statements knowingly and voluntarily and that the statements the government sought to introduce had been made before Collett's contact with the prosecutor. The trial court's determinations are clearly supported by the record of the hearing. Consequently, there is no error in the trial court's denial of Collett's motion to suppress.

## F. Venue in the Central District of Illinois

■ Defendants Andrus and Tom Whittington argue that venue was not proper in the Central District of Illinois. Venue is an essential element of an offense that the government must prove beyond a reasonable doubt. *United States v. Jones*, 174 F.2d 746, 748 (7th Cir.1949). The defendants' theory is that because proof of an overt act is unnecessary to this conspiracy conviction, *United States v. Umentum*, 547 F.2d 987, 991 (7th Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977), venue cannot be based upon the occurrence of overt acts within the district. They urge that absent proof of an agreement in the Central District of Illinois, venue in that district did not exist. Therefore, they contend, the trial court erred in denying their motions for acquittal at the close of the government's case. Andrus also argues that the trial court erroneously denied his motion to dismiss under Fed.R.Crim.P. 18, which provides that the prosecution of a criminal proceeding "shall be had within a district in which the offense was committed."

■ In *United States v. Mayo*, 721 F.2d 1084 (7th Cir.1983), this court rejected the argument defendants press here. In that case, the court held that venue is proper in any district where any overt act in furtherance of the conspiracy occurs. *Id.* at 1089–90. Given the standard set forth in *Mayo*, there was sufficient evidence that venue was proper in the Central District of Illinois. Collett met with Till at the Holiday Inn in Champaign. Collett carried the kilogram of cocaine off the plane in Champaign. Collett and Lutson made numerous stops in Kankakee on trips to deliver or pick up cocaine. Clearly, the government presented ample proof demonstrating that overt acts in furtherance of the conspiracy occurred in the Central District of Illinois and, therefore, that venue was proper.

## G. Severance

■ Andrus, Tom Whittington, and Bill Whittington all moved for severance from the remaining defendants. They now argue that the trial court's denial of their motions prejudiced their right to a fair trial. The trial court has discretion as to whether to grant motions to sever. Appellants bear a heavy burden of showing that they have been prejudiced by the joinder and thereby denied a fair trial. *United States v. West*, 670 F.2d 675 (7th Cir.), *cert. denied*, 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982).

Tom asserts that the trial court should have granted the severance on two grounds. First, he repeats that multiple conspiracies were proved and that trial of the defendants together confused the jury. Since we have already concluded that a single conspiracy was proved, jury confusion did not justify severance. Tom also argues that the joinder precluded him from calling witnesses on his behalf. A few days after Karla Mitchell testified about the conversation in Bill's home when Bill said that Tom would be taking over the business, Tom's counsel moved for severance on the ground that Collett and Lutson would both testify at a separate trial that the conversation never took place. In open court with counsel for Lutson and Collett, Tom's attorney told the court that counsel for Lutson and Collett had told him that if called to testify in a separate proceeding, they would both testify that Bill Whittington never said that Tom would be taking over the business. At the time Tom made the motion for severance, the court acknowledged the importance of the conversation to the government's case against Tom: "Take that [the conversation] out of the case and I might dismiss you [Tom]." The court denied Tom's motion, however, in part because Tom had not provided adequate support that Collett and Lutson would testify as represented and in part due to the motion's untimeliness.

In *United States v. Echeles*, 352 F.2d 892 (7th Cir.1965), this court reversed the conviction of a defendant who had been jointly tried with a codefendant who would have provided exculpatory testimony. Echeles was convicted of suborning perjury in a

narcotics trial. In the underlying trial, Echeles' codefendant had testified that Echeles had not suborned the perjury. In *Echeles* this court held that the joinder deprived Echeles of a fair trial. The court noted how easy severance would have been and that the content of the codefendant's prospective testimony was contained in his testimony at the underlying trial.

In later cases, this court has further defined the holding of *Echeles*. To justify severance, a defendant must provide some support, such as an affidavit or the existence of recorded testimony, that his codefendant would testify in a manner which would exculpate him. Severance cannot be granted on the basis of a vague, unsupported assertion that a codefendant would testify favorably in a separate proceeding. *United States v. Isaacs*, 493 F.2d 1124, 1160–61 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974); *United States v. Johnson*, 426 F.2d 1112, 1116 (7th Cir.), *cert. denied*, 400 U.S. 842, 91 S.Ct. 86, 27 L.Ed.2d 78 (1970).

A defendant seeking severance under *Echeles* must act in a timely fashion. *United States v. Harris*, 542 F.2d 1283, 1313 (7th Cir.1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). Further, a court considering a severance motion should consider the length and complexity of the case. *Isaacs*, 493 F.2d at 1160.

The showing that the defendant must make exceeds a showing that the potential testimony would make acquittal more likely. Rather, the defendant must demonstrate that absent the testimony, he will be deprived of a fair trial.

Considering the factors enunciated above, the trial court did not err in denying Tom Whittington's motion for severance. First, Tom's assertions as to how Collett and Lutson would testify were unsupported. That counsel for Collett and Lutson were present and did not object when Tom's attorney stated that Collett and Lutson would deny the conversation occurred is inadequate support for Tom's assertion.

*United States v. Wood*, 550 F.2d 435, 438–39 (9th Cir.1976).

Certainly, the testimony about the conversation at Bill's home was very damaging to Tom. However, Collett and Lutson were not the only witnesses who could testify about that day. Joyce Reed, the woman with whom Bill lived at the time, testified that Mansuetti and Mitchell came to Bill's home twice in October, 1981. The first time, Tom was not there. The second day, Mitchell and Mansuetti left Bill's approximately two hours before Tom arrived at Bill's house. Reed testified that on the second occasion, Mitchell and Tom were never in the house at the same time. When Tom arrived, his wife was with him, according to Reed. Tom could have called his wife as a witness to say she had not seen Mitchell and Mansuetti at Bill's home. The facts of this case therefore differ from *United States v. Shuford*, 454 F.2d 772 (4th Cir.1971) where a single conversation was instrumental in the defendant's conviction and his codefendant was the only person who could contradict the government's witness. The court's refusal to sever did not deprive Tom of a fair trial.

Andrus argues that instances of prejudice from joinder appear throughout the trial transcript. He directs our attention to a few such examples. First, he complains that the out of court statements of Lutson should not have been admitted against him. Although the government used Lutson's statements, it expressed the intention to impeach Lutson with evidence of his heavy cocaine use if he testified. Andrus argues that the use of Lutson's out of court statements was unfair because the government conceded that Lutson was not a credible witness. Yet Lutson could not be compelled to testify, so Andrus could not cross examine him.

The evidentiary rule excluding conspirator's declarations from the definition of hearsay is "justified in part because of the assurances of accuracy traditionally associated with statements against interest and the community of interest among the

conspirators." *United States v. Gil,* 604 F.2d 546, 549 (7th Cir.1979). The use of coconspirators' declarations does not violate the confrontation clause. *United States v. Papia,* 560 F.2d 827, 836 n. 3 (7th Cir.1977). In this case, the admission of Lutson's out of court statements neither violated Andrus' right to confrontation nor created undue prejudice resulting from joinder with Lutson. Had Lutson and Andrus been tried separately, Lutson's statements would still have been admissible.

■ Another instance of alleged prejudice occurred during Till's testimony about Collett's possession of a handgun. Outside the presence of the jury, the court ruled that Collett's possession of a firearm was a nonverbal assertion in connection with the negotiations for the cocaine sale. The court then permitted the testimony against Andrus, Lutson, and Collett as a statement made in furtherance of the conspiracy. During the argument before the court, Tom's counsel stipulated that the possession of the gun was a statement and requested an instruction that it should not be considered against the Whittingtons. The following colloquy then ensued:

THE COURT: I appreciate your advice. I don't think it's concurred in by Mr. Gambill [Andrus' counsel] however.

MR. GAMBILL: I know I'm probably at odds with the other counsel.

THE COURT: Sometimes I view this game as six on one, and you can think about that.

The colloquy took place outside the presence of the jury, so it alone did not prejudice Andrus. Further, the admission of the gun was not an abuse of discretion. Collett was charged with possessing it during the offense and the possession of a firearm during a narcotics deal "demonstrates the likelihood that a defendant took steps to prevent contraband or money from being stolen," *United States v. Kearney,* 560 F.2d 1358, 1369 (9th Cir.), *cert. denied,* 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977) and "increases the probability of the transaction's success." *United States v.*

*Brant,* 448 F.Supp. 781, 782 (W.D.Penn. 1978).

Before trial, Andrus and the government entered into a stipulation, which included a statement that Lutson called someone in Louis Sternberg's area code and referred to that person as "my Louie." The stipulation also stated that Mansuetti phoned Sternberg and called him Louie. The stipulation contained other facts, which Andrus intended to use to show that "Louie," the source, was Sternberg, not him. The government did not, of course, object to the stipulation. Lutson's counsel, however, objected because it contained statements as to Lutson's activities. The court sustained Lutson's objections and rejected the stipulation. Undoubtedly, rejection of the stipulation made it more difficult for Andrus to present the contents of the stipulation. During cross-examination of Till, Andrus attempted to elicit the facts included in the stipulation. Counsel for Collett and Lutson objected on the ground of hearsay, and the court sustained the objections. Andrus' counsel could have brought out most of the items in the stipulation in an admissible form, however. For example, Andrus' counsel could have asked Mansuetti whether he phoned Sternberg and called him "Louie." Refusal of the stipulation did not deny Andrus a fair trial.

■ Andrus argues that the testimony of Agent Till prejudiced his defense. Lutson called Till to the stand to testify about a chart Till, Mansuetti, and Mitchell had made. Till testified that the chart was captioned "People v. Andrus." Andrus never objected to the testimony, but rather, suggested that the court instruct the jury that "People v. Andrus" was merely a reference to the same case. The court agreed and so instructed the jury.

■ Andrus argues that the testimony of Lutson's mother prejudiced him. Lutson's counsel asked Mrs. Lutson what Louis Sternberg's mother's name was. The government objected. The court overruled the objection, and Mrs. Lutson answered, "Paul." Andrus contends that the response was inconsistent with his defense.

Andrus was not unduly prejudiced by Mrs. Lutson's testimony. The danger of joinder of defendants is that the jury will associate the guilt of one defendant to another defendant or will be confused. A defendant does not have a right against having his codefendant elicit testimony which may be damaging to him. Andrus could have cross-examined Mrs. Lutson, but he chose not to.

■ Finally, Andrus argues that the admission of certain pages of a record book found at Tom's home prejudiced Andrus. The book contained what appeared to be records of transactions in cocaine and other controlled substances. Although the court did not admit the entire notebook, it did admit certain pages of the notebook. Those pages included references to "meth" and "crank," slang for other kinds of controlled substances. The court admitted the pages as Tom's declarations in furtherance of the conspiracy to distribute cocaine. The references to other substances remained on the page, so the copy of the page shown to the jury would accurately reflect the original page. Andrus' name did not appear on any of the pages. The suggestion that Andrus' codefendants may have been involved in the distribution of other substances was not so prejudicial to Andrus that it deprived him of a fair trial.

The court's denial of Andrus' motion to sever was not an abuse of discretion.

## H. Introduction of telephone records

The government offered Southern Bell Telephone Company's records of Louis Andrus' telephone. Although the court never received the records in evidence, the custodian of Southern Bell testified about the records, and the government referred to them during closing arguments. The records in question showed that calls had been made from Andrus' residence to the residences of other defendants and other individuals. Andrus objected to the records on two grounds. First, the government had failed to produce all the records during discovery. Second, the government never connected the calls to other individuals to the conspiracy charge.

■ When Andrus objected to the records because he had not received them during discovery, the court questioned the government. The court concluded that the government had produced some, but not all, of the records and that the failure to produce all the records was not deliberate. The court did not suppress the evidence as a discovery sanction. Instead, it permitted Andrus to question the Southern Bell records custodian during a recess. Andrus did not before the trial court or here assert how he was prejudiced by the government's failure or what preparation he was precluded from making as a result of the untimely disclosure of the records. Whether to impose a discovery sanction is within the discretion of the trial judge. *United States v. Bockius*, 564 F.2d 1193, 1196 (5th Cir.1977). The trial court's finding that the government had not acted deliberately and its consequent ruling not to suppress the records was not an abuse of discretion.

■ Additionally, Andrus complains that introduction of the records of calls between his residence and persons who were not members of the alleged conspiracy was improper and created the impression in the minds of the jurors that Andrus was involved in many cocaine transactions beyond those alleged. The records showed calls between Andrus and Louis Sternberg. The government had introduced evidence at other points in the trial that Sternberg had been involved in some of the transactions in question. As to the other individuals on the records, however, the government never suggested that the calls were made for the purpose of negotiating cocaine transactions. With the exception of the Sternberg records, therefore, any prejudice asserted by Andrus is unlikely. More importantly, however, Andrus did not object at the time of closing argument to the government's reference to the records. Nor did Andrus ever move that the court instruct the jury not to consider the testimony on the phone records. Consequently, Andrus has not preserved the issue of relevance on appeal.

## I. Instructions to the jury

All defendants argue that the court erroneously refused to give certain tendered jury instructions and that certain instructions that were given to the jury were improper.

### 1. Entrapment and withdrawal

Collett and Lutson argue that the trial court failed to give instructions on their theory of defense. Collett and Lutson asserted that they withdrew from the conspiracy in the fall of 1981 and that the government entrapped them into reentering the conspiracy for the January, 1982 cocaine transaction. Although the court did give an instruction on entrapment, the defendants argue that it should have given an instruction on the burden of proving entrapment and an instruction on withdrawal.

As evidence of withdrawal, George Collett called his wife, Linda, who testified that she had told George in September, 1981 that she was filing for divorce because of his association with Lutson. She told Collett that she did not like Lutson's involvement with drugs. She also testified that around November 25, 1981 Collett moved back home with her. She overheard a phone conversation between Collett and Mansuetti in which Collett told Mansuetti that he wanted nothing further to do with Lutson, Mansuetti, or Mitchell. After that time, Collett had no further dealings with Lutson, Mitchell, or Mansuetti, according to Linda Collett. Also, Agent Willis of the Illinois law enforcement agency testified that according to telephone records, there had been no calls between the Collett home and the other conspirators between November 25 and December 8.

Lutson did not point to any specific evidence of his withdrawal from the conspiracy, but merely told the trial court that "there had been inferences or testimony that [Lutson] just quit."

■■■■■ A conspirator is liable for the acts of his coconspirators as long as he is a member of the conspiracy. Once he with-

draws from the conspiracy, however, his liability ceases as to acts committed after his withdrawal. *United States v. Knippenberg*, 502 F.2d 1056, 1059 (7th Cir.1974). Withdrawal from a conspiracy requires "affirmative action which disavows or defeats the purpose of the conspiracy, either by 'making a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach coconspirators.'" *United States v. Dorn*, 561 F.2d 1252, 1256 (7th Cir.1977) (quoting *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965)). The withdrawal must be complete and in good faith. *Dorn*, 561 F.2d at 1256.

■■■■■ A defendant in a criminal case has a right to have the jury instructed on any theory of defense which is "supported by law and which has some foundation in the evidence, however tenuous." *United States v. Grimes*, 413 F.2d 1376, 1378 (7th Cir.1969). To warrant an instruction to the jury on a particular defense, however, the record must contain sufficient evidentiary support for the elements of the defense. *United States v. Patrick*, 542 F.2d 381, 388 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977) (jury instruction on duress not warranted when there had been no evidence of an immediate threat, one of the elements of the duress defense); *United States v. Perry*, 478 F.2d 1276, 1278 (7th Cir.), *cert. denied*, 414 U.S. 1005, 94 S.Ct. 363, 38 L.Ed.2d 241 (1973) (entrapment instruction not warranted when there had been no evidence that government had implanted disposition with defendant).

■■■■ Collett and Lutson argue that the record supported the withdrawal instruction. Lutson provided no evidence of withdrawal. Consequently, he was not entitled to an instruction on that subject. Collett did produce some evidence that he had cut ties with his coconspirators, and that he had communicated the break to Mansuetti, who was then a coconspirator. Unless Collett can avail himself of the entrapment defense, however, withdrawal is of minimal

assistance to him. If Collett was entrapped into rejoining the conspiracy, then his liability for the acts of his coconspirators ceases when he withdrew. If Collett rejoined the conspiracy of his own accord, then his temporary withdrawal is immaterial. Collett produced sufficient evidence to justify a withdrawal instruction, but the court's failure to do so was harmless error.

The jury found Collett guilty on three counts: conspiracy to distribute cocaine, possession of cocaine with intent to distribute it, and possession of a firearm during the commission of a felony. Withdrawal applies only to the conspiracy count, not to the substantive offenses. Even if Collett withdrew from the conspiracy, he was still liable for all the acts committed in furtherance of the conspiracy before his withdrawal. The allegations in the conspiracy count even without the allegations as to the final deal in January, 1982 were sufficient to make Collett liable for conspiracy.

■■■ Both Collett and Lutson argue that the court failed to instruct the jury on the burden of proving entrapment. The court instructed the jury on the elements of entrapment and also stated, "As to the Defendants George E. Collett and William J. Lutson, the Government must prove that the defendant was not entrapped as I have defined that term for you in these instructions." The court continued, "If you find from your consideration of all the evidence, that each of the three propositions has been proved beyond a reasonable doubt as to a defendant, then your verdict should be guilty as charged in count one as to that defendant." The court adequately instructed the jury that the government had to prove beyond a reasonable doubt that Collett and Lutson were not entrapped.

### 2. Admission by silence

Tom objects to the court's instruction on admission by silence. The court instructed the jury:

Evidence has been introduced that statements made by the Defendant Billy Ray Whittington implicating the defendant Larry Thomas Whittington in the conspiracy charged in count one, were neither denied nor objected to by Larry Thomas Whittington. If you find that Larry Thomas Whittington actually was present and heard and understood the statements and that they were made under such circumstances that the statements would have been denied if they were not true, then you may consider whether his silence was an admission of the truth of the statements.

The instruction referred to Karla Mitchell's testimony as to the conversation in November, 1981 in which Bill stated, in Tom's presence, that Tom would be taking over the business. Tom attacks the instruction on two grounds. First, he contends that by naming him three times, the instruction unduly focused the jury's attention on him. Second, Tom argues that the court should not have permitted the jury to consider the testimony as an admission in the first place.

■■■ Tom correctly argues that a trial court should not, in instructing the jury, unduly emphasize the role a defendant has allegedly had in a multidefendant trial. *United States v. Continental Group, Inc.,* 456 F.Supp. 704, 722 (E.D.Penn.1978), *aff'd,* 603 F.2d 444 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). In the admission by silence instruction, however, the court did not stress the role Tom allegedly played in the conspiracy, but rather, merely related the abstract instruction tendered by the government to the evidence in the case. Given the length of the trial and the number of witnesses who testified, failure to mention Tom's name would have rendered the instruction meaningless to the jury. As the court stated in *United States v. Holley,* 502 F.2d 273 (4th Cir.1974):

Jury instructions "should be drawn with reference to the particular facts of the case on trial," ... and "ought not be conveyed merely in boilerplate abstractions".... Because abstract instructions that are not "adjusted to the facts of a particular case," ... may "confuse the jury," ... it has been held plain error

for a district judge to fail to "relate the evidence to the law."

*Id.* at 276 (citations omitted). The court here correctly stated the law on adoptive omissions, tailoring that law to the facts of the case. Tom was not unduly prejudiced by the insertion of his name into the instruction.

■■■ Tom also argues that the admission by silence instruction, when read in conjunction with the instruction that "in determining whether a defendant became a member of a conspiracy, you may consider only the acts or statements of that particular defendant" confused the jury. Both instructions were accurate statements of the law. The law on admission by silence recognizes that when a person acquiesces in certain statements, he may, under proper circumstances admit the truth of those statements. His silence, then, may be a statement. The two instructions were neither contradictory nor confusing. We have already concluded that the trial court did not err by considering the silence to be an admission in its coconspirator ruling. Consequently, the court correctly instructed the jury on Tom's silence. As the court in *United States v. Moore,* 522 F.2d 1068 (9th Cir.1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976), stated:

> Before admitting the proffered admission by silence, the trial judge must determine, as a preliminary question, whether the statement was such that under the circumstances an innocent defendant would normally be induced to respond.... Ordinarily, the jury then decides, with proper instructions from the court, whether in the light of all the surrounding facts, the defendant actually heard, understood, and acquiesced in the statement.

*Id.* at 1075 (citations omitted). Here, the trial court made the necessary preliminary determination when it considered the statement in its coconspirator ruling. As long as the court correctly instructed the jury on the admission by silence, there was no error in permitting the jury to consider Tom's silence.

### 3. Supplemental instruction

Tom and Bill complain that an instruction given to the jury after it had begun deliberations prejudiced their cases. During its charge to the jury, the court gave the following instruction:

> In considering the evidence against Defendants Larry Thomas Whittington and Billy Ray Whittington under count one of the indictment, you should consider only the evidence dealing with events occurring between the time span of the last week of September, 1981 and December 7, 1981.

Immediately after the jury began deliberating, the government submitted a revised instruction as to the period of time the jury could consider in determining whether Tom or Bill were members of the conspiracy. The instruction stated:

> In considering whether or not the defendant Larry Thomas Whittington and Billy Ray Whittington knowingly and intentionally became members of the conspiracy as charged in count one of the indictment, you should consider only the evidence dealing with events occurring between the time span of the last week of September 1981 and December 7, 1981.

Although the jury was told that it could only consider events within that time frame to determine whether Tom and Bill *became* members of the conspiracy, the instruction did not preclude them from considering events after December 7, 1981 in determining the culpability of Tom and Bill. Tom and Bill now complain that the jury may have considered the transactions in January.

■■■ Neither counsel for Tom nor Bill objected to the instruction. They did not preserve the issue for appeal. *United States v. Torres,* 733 F.2d 449, 458 (7th Cir.), *cert. denied,* — U.S. — 105 S.Ct. 204, 83 L.Ed.2d 135 (1984). We may consider the issue only if the court's instruction constituted plain error. Plain error occurs when, in light of the entire record, the instruction in question had a probable impact upon the finding of guilty. *United States v. Jackson,* 569 F.2d 1003, 1010 (7th

Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978). After reviewing the record, there is no likelihood that the supplemental instruction had an impact upon the verdict. The evidence against Tom and Bill included Mitchell's testimony about the two meetings at Bill's home in October and the meetings with Tom Whittington in November in Bakersfield. If the jury found that based on the evidence of events occurring between September and December 7, 1981 Tom and Bill Whittington became members of the conspiracy, then that finding alone would warrant a guilty verdict on the conspiracy charge.

### 4. Witnesses' use of drugs

■■■ Andrus tendered a cautionary instruction about testimony of an addict. The instruction stated in part, "An addict has a constant need for a supply of drugs and for money to support his habit, and also may have abnormal fear of imprisonment in which his supply of drugs may be cut off." The court refused the instruction because the evidence did not support it. The court did caution the jury that the testimony of Mansuetti, Mitchell, and Becker should be considered "with caution and care." Moreover, Andrus' counsel had ample opportunity to cross-examine each of these witnesses about their use of drugs. Thorough cross-examination about drug use and a general cautionary instruction on conspirator informants adequately emphasize reliability problems. *United States v. Rodgers,* 755 F.2d 533, 549 (7th Cir.1985).

### J. Sufficiency of the evidence

■■■ Andrus, Bill, and Tom argue that there was insufficient evidence upon which to convict them. If "after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the conviction is supported by sufficient evidence and must be affirmed. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Green,* 735 F.2d 1018, 1022–23 (7th Cir. 1984).

■■■ Andrus and Bill both argue that the government failed to prove they agreed to the conspiracy. Because an agreement is difficult to prove with direct evidence, "circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof." *United States v. Redwine,* 715 F.2d 315, 320 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). Further, "[a] coconspirator need not know the details, ... or every objective of the conspiracy.... Knowledge of the conspiracy's essential nature, ... or the 'kind of criminal conduct ... in fact contemplated,' ... is sufficient." *United States v. Williams,* 737 F.2d at 615 (citations omitted).

■■■ Viewed in the light most favorable to the government, the evidence showed that during the time of the conspiracy, Collett telephoned Andrus on numerous occasions. From a hotel room registered to Andrus in Detroit, calls were made to Lutson and Collett. Collett went to the hotel room to pick up cocaine from someone named "Louie." In December and January, Collett went to Paducah to pick up cocaine. On both trips he met Andrus. Late in the night of the last trip to Paducah, someone named Louie called Till in Champaign to ask if everything was all right.

Bill also argues that there was insufficient evidence of intent to form an agreement. The government's proof against Bill consisted of Mitchell's testimony about two visits to Bill's home. In early October, Collett sold cocaine to Bill. Bill put the cocaine in the back of his house. Several people stopped by, went to Bill's back room, and left. Later in October, Bill talked to Collett about the cocaine business. He said he had many buyers for cocaine and that Tom would be taking over the business. Viewing Mitchell's testimony in the light most favorable to the government, those two occasions established that Bill intended to join the conspiracy to distribute cocaine. Bill complains that Mitchell's testimony was inconsistent with Mansuetti's testimony and is therefore an inad-

854

equate basis for conviction. Mansuetti did not testify at all about the first visit to Bill's house. He testified he had been at Bill's house when Tom was there and that he had seen people talking.

A court reviewing a conviction on appeal must consider the evidence in the light most favorable to the government. The court may not weigh the evidence or assess the credibility of witnesses. The evidence against Andrus and Bill and Tom was sufficient that a reasonable juror could find them guilty beyond a reasonable doubt.

The convictions of the defendants are AFFIRMED.